**ST. REGIS PAPER CO. v. STUART.**
**STUART v. ST. REGIS PAPER CO.**
**Nos. 4803, 4804.**

United States Court of Appeals,
First Circuit.
July 26, 1954.
Rehearing Denied Aug. 18, 1954.

---

See also, 102 F.Supp. 195.

Bailey Aldrich, Boston, Mass. (Horace R. Lamb, New York City, Choate, Hall & Stewart, Boston, Mass., and LeBoeuf, Lamb & Leiby, New York City, on the brief), for St. Regis Paper Co.

James D. St. Clair, Boston, Mass. (Hale & Dorr, Boston, Mass., on the brief), for George A. Stuart.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

These are cross-appeals from a judgment entered on the verdict of a jury for the plaintiff in an action by a salesman to recover commissions under a letter contract reproduced in full in the margin.[1]

---

1. Taggart Brothers Company, Inc.
   60 East 42nd Street
   New York
   July 5th 1935.

Mr. A. B. Carey,
Mr. Geo. A. Stuart.
Gentlemen:—

This will confirm our conversation to-day—at which time you gentlemen agreed to sell Flour and Potato Bags on the following basis:

We to pay each of you salary of $175.00 per month.

In addition—we are to pay an allowance of 6 cents per mile when cars are used for making sales; also traveling expenses in connection with sales—all of which (cars and traveling expenses) are estimated at approximately $2,000 per annum—per man.

In consideration of the above you estimate you will return to us sales of 5,000,000 Flour Bags and 2,500,000 Potato Bags—per annum. In the event such sales of Flour and Potato Bags are made, and delivered, it is agreed all sales of

The plaintiff, George A. Stuart, was graduated from the University of Maine in 1910 and for the next 25 years he worked in various agricultural capacities, at first for the United States and later for the Commonwealth of Pennsylvania, where he eventually became the Director of the Bureau of Markets. In 1935 he lost that position due to a change of administration. Up to that time he had no experience in selling. He had, however, done research in the field of paper manufacturing, and he had been active in developing and encouraging the use in Pennsylvania of paper bags for the packaging of flour and potatoes. In the course of these latter activities he developed a large acquaintance among Pennsylvania millers (indeed he was elected in effect the secretary of the Pennsylvania Millers Association although his wife held the title) and others in the business of producing and marketing foods, and allied occupations. Included in the latter group was the Albert B. Carey mentioned in the letter contract, who was a paper bag salesman for Taggart Brothers Company, Inc., now dissolved, a former subsidiary of Taggart Corporation, which before suit merged with the defendant, St. Regis Paper Company.[2]

Carey, believing that Stuart might be of assistance in selling paper bags, approached the latter at about the time he lost his position, and finding Stuart interested, took up the matter of his employment by Taggart Brothers Company, Inc., with A. T. Plunkett, then vice-president of the company. After one or two preliminary discussions, all three met in the company's office in New York City and the letter agreement reproduced above, which had already been prepared, was signed on the day of its date.[3]

Thereafter Carey and Stuart for the most part, although not invariably, traveled and worked together, Carey teaching Stuart salesmanship and Stuart introducing Carey to prospective customers among his friends and acquaintances in Pennsylvania. This arrangement, however, did not work out to the satisfaction of anyone and it came to an end in March, 1937, following a conference between Plunkett, Carey and Stuart in New York. There is a dispute as to what was said at that meeting. Plunkett testified that he told Carey and Stuart that they had frequently expressed dissatisfaction with their salaries and with their failure to earn any commissions, and that in consequence he terminated the previous arrangement

---

Flour and Potato Bags, in excess of the 7,500,000 referred to, added compensation, in the form of commission, will be allowed thereon—for such excess sales—at the following rates:—

| | |
|---|---|
| 1/8's | $ 1.70 M |
| 1/16's | 1.15 " |
| 6's | .70 " |
| 3's | .70 " |
| 2's | .50 " |

Potato Bags $1.00 M

It is agreed you will also be agreeable, in the course of your travels, to soliciting such Miscellaneous Bag sales as we may designate—it being understood no commissions shall be paid for, or on, such Miscellaneous sales.

It is further agreed your territory for above sales will embrace Pennsylvania, Delaware, Maryland and District of Columbia [in ink, New Jersey ATP]—and Maine only for Potato Bags. It is understood such Flour and Miscellaneous accounts as are now reserved for other salesmen—shall continue on present basis until otherwise changed.

With respect to Mr. George A. Stuart— it is understood this arrangement is to become effective Monday, January 8th 1935.

It is agreed this arrangement is to be on a yearly basis—either of the signing parties reserving the right to cancel upon reasonable and sufficient basis with, in any event, not less than thirty days (30 days) notification.

> Very truly yours,
> Taggart Brothers Company Inc.
> (signed) A. T. Plunkett
> Vice President

(signed) Albert B. Carey
(signed) Geo. A. Stuart

2. Taggart Corporation was not served and did not appear. St. Regis Paper Company has agreed for present purposes to pay any judgment that may be rendered against either defendant.

3. There is, apparently, a typographical error in the letter, for the date Stuart was to begin work, and did begin work, was July 8, 1935, not January 8, 1935.

altogether and raised their salaries $500 per year apiece. Stuart agreed that he had expressed dissatisfaction with his salary and his failure to earn commissions, and admitted that his salary was raised $500 per year, but he denied that the letter agreement was terminated so far as commissions were concerned. At any rate, after March, 1937, Carey and Stuart worked separately and thereafter saw each other infrequently, usually only at company sales meetings. From 1937 on, Stuart concentrated on selling potato bags in Maine, and in 1943 moved to Springfield, Massachusetts, where he has since resided, in order to be nearer his field of activity. Carey never went to Maine but continued to sell flour and potato bags in Pennsylvania, later spending much of his time selling cement and other multi-wall bags of types not covered by the agreement.

Over the years following 1937, Stuart's salary was increased from time to time until in 1948 he was receiving $475 per month. He was never paid any commissions and he never asked for or received any full accounting of the deliveries made on the orders he booked, although he testified that he thought he might be able to claim commissions under his letter contract for every year since 1943 and was reasonably sure he could do so for every year after 1946. He was discharged at the age of 63 in July, 1949, two years before he was due for retirement. He made his first demand on the defendant for commissions in March, 1951, and he brought the instant action in October of that year in the Superior Court of the Commonwealth of Massachusetts from which it was removed to the court below, there being the requisite diversity of citizenship and amount in controversy for federal jurisdiction under Title 28 U.S.C. § 1332(a)(1).

Upon removal the defendant moved to dismiss the action for failure to join an indispensable party, to wit, Carey. The District Court denied the motion without prejudice and the case went to trial by jury. During the trial the defendant protected its rights by motions for a di-

rected verdict, which were denied, and after verdict for the plaintiff, for judgment notwithstanding the verdict and in the alternative for a new trial, which was also denied.

The District Court, in denying the defendant's motion to dismiss for failure to join Carey as an indispensable party, by necessary implication ruled that the letter agreement might legally be construed to constitute an obligation to pay commissions to Stuart and Carey severally, and that so construed the extent of the defendant's obligation to Stuart alone was capable of rational ascertainment. By denying the defendant's subsequent motions for judgment, and for judgment notwithstanding the verdict, the court repeated the above rulings, and ruled in addition, first, that there was substantial evidence to permit findings by the jury in accordance therewith, and second, that on the evidence the jury could in reason find that the agreement as to commissions remained in full force and effect in spite of the fact that its other specific provisions had admittedly been departed from or abandoned many years before. In accordance with its rulings the court submitted the following three specific questions to the jury. It asked, first, whether the agreement so far as commissions were concerned was made with Stuart and Carey (a) severally, (b) jointly, or (c) with no one; second, if question one were answered either (a) or (b), (the jury answered it (a)), whether, if a commission contract had originally been made, it was later at any time, formally or informally, altered so that thereafter Stuart either explicitly or impliedly agreed to be paid on the basis of a salary and expenses without commissions (i e., whether there had occurred a termination, abandonment or rescission of the commission feature of the agreement,) which the jury answered "No", and, third, the extent of damages, which the jury answered by giving the plaintiff $38,190.75 principal and $7,890.98 interest, or a total of $46,081.73.

The preceding brief statement of the case provides enough background for consideration of the defendant-appellant's basic contentions on its appeal. These are, (1) that on its face the letter agreement was unambiguously joint as to the obligation to pay commissions, (2) that unless the agreement is so interpreted it is too indefinite to be enforceable, (3) that since Stuart and Carey had, or have, a joint interest in any commissions which might be payable under the contract, Stuart's action must be dismissed under Rule 19(a) F.R.C.P. 128 U.S.C., for failure to join Carey as an indispensable party plaintiff, and (4) that on the record the conduct of the parties was such as to work a termination or abandonment of the entire agreement as a matter of law.

■ The first three contentions hinge on the question whether the jury could properly find that the defendant's obligation to pay commissions under the agreement ran to the obligees jointly, or ran to each one of them severally. And this question is to be determined under the law of New York for that is the jurisdiction to which the Massachusetts courts would refer because the contract was made in New York and its performance was not contemplated in any other particular jurisdiction but in several eastern states from Maryland to Maine. See Autographic Register Co. v. Philip Hano Co., 1 Cir., 1952, 198 F.2d 208, 212; Wetherell Bros. Co. v. United States Steel Co., 1 Cir., 1952, 200 F.2d 761, 763 and the Massachusetts cases cited therein.

■ It is the law of New York, and the general rule of the Common Law, that when two or more persons undertake a contractual obligation there arises a presumption of law that they undertake jointly and that words of severance are necessary to overcome this primary presumption. U. S. Printing & Lithograph Co. v. Powers, 1922, 233 N.Y. 143, 135 N.E. 225; 2 Williston on Contracts (Rev. Ed.) § 322; Am.Law Inst., Restatement, Contracts § 112. But no similar presumption arises when a promise is made to several persons for then "the intention of the promisor as expressed in the contract determines whether the right thereby created is joint or whether rights are created which are several or are joint and several." Am.Law Inst., Restatement, Contracts § 128; 2 Williston on Contracts (Rev. Ed.) § 325; Emmeluth v. Home Benefit Ass'n, 1890, 122 N.Y. 130, 25 N.E. 234, 9 L.R.A. 704. Consequently we approach the question whether the obligation to pay commissions was joint or several without indulging in any presumption one way or the other, and so approached we think it clear that the defendant's contention that the obligation was joint as a matter of law cannot be adopted.

The agreement was arrived at by laymen, and it is obvious that the letter contract embodying the agreement was not drawn by a person versed in the law. Doubtless no one of the contracting parties had the slightest inkling of the legal problems to arise in the course of time out of what must have seemed to them a normal and mutually advantageous business arrangement couched in practical every-day language. Under these circumstances it would be vain to look sharply for legal niceties lurking in the words used, or to draw fine legal distinctions from the omission of words which might have been used. Instead of attempting close analysis of the language we must try to ascertain the meaning of the parties from the words they used, and from whatever other admissible evidence of their meaning there may be, and, if their intention is reasonably ascertainable, enforce their agreement since there is nothing about it contrary to public policy. Approached in this way, we think the court below properly submitted the question of the contracting parties' meaning with respect to the payment of commissions to the jury, and that the jury's answer to that question cannot be successfully challenged by the loser, the St. Regis Paper Company.

Certainly the obligor's promise to pay salaries to Carey and Stuart was several.

It is clearly so expressed in the contract. And so also, although not so clearly expressed, was the promise to pay traveling and other expenses. It can hardly be reasonably supposed that it was not intended to reimburse each salesman his own expenses incurred in making sales.

There are no clear words of severability in the promise to pay commissions. But, considering the circumstances surrounding the drafting of the contract alluded to above, we do not think this omission particularly significant. Nor is there any strong inference of severability with respect to the promise to pay commissions as there is with respect to the promise to pay expenses. On the other hand, however, we cannot infer a joint obligation to pay commissions from the unenforceability of the contract for indefiniteness unless it is so construed, as the defendant-appellant argues, for we do not find the contract too vague to be enforced when it is construed as a several obligation so far as commissions are concerned. It is true that the contract itself does not provide any formula for a division of commissions between Carey and Stuart. It is also true that the conduct of the parties under the contract sheds no light by showing a practical construction of its terms in this respect, for no commissions were ever paid to either salesman. But the plaintiff submitted a logical, reasonable and practical formula by which commissions might be apportioned between the two by putting in evidence the gross sales subject to commissions made by both salesmen, and then suggesting a division of the excess of sales above the minimum essentially on the basis of the ratio of each salesman's sales in excess of each one's share of the quota. And the court submitted this method of apportioning commissions to the jury as one, but not necessarily the only, method for calculating the plaintiff's damages if the jury should reach that question.

Reverting to the contract, we think it must have been contemplated by all concerned that Stuart and Carey would work together as a team, as they usually but not always did at first, at least until Stuart learned salesmanship and Carey became acquainted with Stuart's prospective customers in Pennsylvania. But the jury could reasonably infer that such a peculiar arrangement for salesmen was meant to be only temporary, and, since the contract had no definitely specified time limit but was to be on a yearly basis, infer that the parties probably intended the cooperative arrangement to last only until the purposes it was meant to serve were accomplished, after which the salesmen were to operate under the contract independently of each other, as they actually did. It is true that Plunkett testified that the commission feature of the contract was eliminated in 1937, but of course the jury was not required to accept his testimony as true. In spite of Plunkett's testimony, the inference outlined above is enough to take the question of joint or several obligation to pay commissions to the jury.

The question of termination or abandonment was also properly submitted to the jury. In addition to what has already been said bearing on that question, it is pertinent to note that although Plunkett testified that the entire agreement was terminated and abandoned in March, 1937, Stuart testified that as late as 1941 Plunkett told him that he would earn more commissions if he moved to Maine where he could better concentrate on selling potato bags. It is true that Stuart's delay until 1951 in pressing his claim lends support to the conclusion that the entire contract was indeed terminated and abandoned as Plunkett testified. But, on the evidence, the jury could find that Stuart did not press his claim until 1951 because (a) up to the time of his discharge in 1949 he was afraid he would lose his job and pension privileges, (b) he was not sure in 1947 that he had met and exceeded his quota, and (c) he could not find his copy of the letter contract until 1951 and thought he had to have it to press his claim successfully.

The defendant-appellant further contends, in addition to asserting that

no damages can be assessed at all because there is no legal way of apportioning commissions, a matter we have already considered, that the evidence does not support the award of damages made by the jury. It says that the only explanation for the jury's verdict of $38,-190.75 is that the jury found Stuart not entitled to any commission on flour bags, a matter in dispute, and then took his evidence of total potato bag sales for the years 1946–1949, inclusive, of 48,-190,546, deducted the entire separate potato bag quota for the four years of 10,000,000 bags, leaving 38,190,546 bags which at the contract rate of $1.00 per thousand gives the figure $38,190.55. (It attributes the 20-cent discrepancy to a mathematical error made by the jury.) The defendant-appellant says that this verdict cannot stand because in reaching it the jury must have disregarded the flour bag quota in violation of the court's categorical instruction, to which the plaintiff did not object, that "there is a floor which you must reach before you begin to calculate anything, and that floor is this, you must have a situation in which, with respect to potato bags, two and one-half million are sold in a year through the efforts of Carey and Stuart, *and* five million flour bags are sold through the efforts of Carey and Stuart, before any commissions are payable on the bags." (Italics ours.)

In answer to this contention it is enough to say that the contract does not provide with absolute clarity that both flour *and* potato bags in the amounts specified for each must be sold annually before any commissions are due, and the court told the jury that although it might so find, it could also if it chose adopt the formula testified to by the plaintiff's expert accountant based on sales of potato bags alone which the court described as "that two and a half million potato bags had to be sold in a year by the two of them, and once you found out that two and a half million potato bags were sold, then you would make an allocation of credit on the basis of finding out what

each one sold and how much the excess was and attribute the excess in proportion to the several sales of the two individuals." Indeed, it is logical for the jury to have adopted the latter formula in view of its findings that the obligation to pay commissions was several and had not been abandoned, and in view of the clear evidence that the two salesmen soon separated, Stuart concentrating thereafter almost exclusively on selling potato bags alone.

The defendant-appellant's contentions that the District Court twice erred in excluding evidence have upon consideration been found too insubstantial to warrant discussion.

The same may be said of the contention made by plaintiff-appellant on his cross-appeal with respect to the amount of interest awarded by the District Court.

The judgment of the District Court is affirmed without costs in this court to either party.