**STRUCTURAL DYNAMICS RESEARCH CORPORATION, Plaintiff,**

v.

**ENGINEERING MECHANICS RESEARCH CORPORATION et al., Defendants.**

Civ. A. No. 4–71586.

United States District Court,
E. D. Michigan, S. D.

Sept. 9, 1975.

Richard A. Harvey, Harvey, Kruse & Westen, P. C., Detroit, Mich., Thomas S. Calder, Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, for plaintiff.

Robert G. Cutler, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for defendants.

## MEMORANDUM OPINION [1]

FEIKENS, District Judge.

### I.

Structural Dynamics Research Corporation (SDRC) brought this action against three former employees, Kant Kothawala, Karan Surana and Robert Hildebrand, for unfair competition, misappropriation and misuse of confidential and trade secret material, breach of confidential disclosure agreements and interference with SDRC's customer relations, and against Engineering Mechanics Research Corporation (EMRC) for conspiring with the individual defendants to accomplish the above purposes. It seeks both damages and a permanent injunction.

SDRC is an Ohio corporation with its principal place of business at Cincinnati, Ohio. EMRC is a Michigan corporation with its principal place of business at Southfield, Michigan. Kothawala, Surana and Hildebrand are all residents of Michigan.

---

[1]. This opinion constitutes findings of fact and conclusions of law in accordance with the requirements of Rule 52(a), Federal Rules of Civil Procedure.

This court has jurisdiction over the subject matter and over all parties to this action. This case was tried before the court sitting without a jury.

Both SDRC and EMRC are engaged in the business of structural analysis and testing. They are also engaged in the development of computer programs for such purposes for use in their business and for lease to other users.

Kothawala, Surana and Hildebrand were all formerly employed by SDRC in various technical capacities. Kothawala was employed by SDRC between August 3, 1972 and December 31, 1972 as a member of its Technical Staff.[2] Surana worked for SDRC from February of 1970 to January of 1973, initially as a project leader in the computer operations department and later as a member of the Technical Staff. Hildebrand was employed by SDRC as a project manager between August of 1972 and December 31, 1972. Each signed an Employee Patent and Confidential Information Agreement while so employed and, in addition, Kothawala executed an Employment Agreement.

These three individuals are now employed by EMRC. Kothawala is the President and sole shareholder. Surana is Vice-President of Engineering. Hildebrand is Manager of Applications.

Structural analysis involves, generally speaking, the prediction of how a physical structure will react when forces are applied to it. One of the methods used to solve structural analysis problems is a finite element computer program. The technical part of this dispute concerns two such programs. These computer programs are used to obtain an approximation of the reaction of a physical structure when forces are applied to it. This approximation is termed a mathematical model. It simulates actual conditions.

The method involves drafting a model of the structure under analysis. The model is then divided into sections or substructures known as elements. The elements are connected together at points called nodes or nodal points. The nodes are assigned coordinates which specify their location within the structure. The coordinates plus the material properties of the structure, the forces to be applied and the constraints on the structure are written in terms of mathematical equations. The availability of high speed computers permits the rapid solution of these equations in a computer program. The input data is "read" and in practical effect is converted into meaningful data which predicts reactions of the structure with sufficient accuracy to be attractive for commercial use.

The finite element computer programs generally in use prior to 1971 employed primarily straight sided elements such as triangles and rectangles. When the structure involved curved surfaces, straight sided elements had cost and accuracy limitations as a large number of elements were required to approximate the structure's configuration.

Thus, the concept of employing curved and irregular shaped elements and "higher order" elements with different nodal structures termed "isoparametric elements" was under investigation. Isoparametric elements, in a properly designed program, offer substantial advantages over conventional finite element programs since the use of curved and irregular shaped elements permits the user to achieve at least as accurate results at a lower cost due to the reduction of the number of elements necessary to prepare models of a structure to be tested.

SDRC first became interested in isoparametric elements when, in the fall of

---

**2.** The Technical Staff is comprised of employees having significant technical expertise in the various areas of interest to SDRC. These employees provide technical assistance to project engineers and engage in research and development.

1971, Surana and Russell Henke, vice-president of SDRC, attended a conference at Urbana, Illinois, where a number of technical papers were delivered. References to isoparametric elements appeared in some papers. Kothawala, then an employee of General Motors, also attended the conference.

Following the Urbana conference Surana began to investigate isoparametric technology thoroughly, primarily from the literature. Prior to this time Surana did not have a substantial background or knowledge in the field of isoparametric finite element technology. He concluded that an isoparametric program would be useful and advantageous to SDRC and so informed SDRC's management. SDRC encouraged Surana to continue his efforts but also required him to devote time to revenue producing projects. In April, 1972 SDRC gave formal recognition to Surana's isoparametric research by the establishment of a time charge account. By that time Surana had reduced to writing certain preliminary equations, computations and sketches necessary to the development of a program. He continued preliminary development work as time permitted until August.

In August of 1972 Kothawala joined SDRC as a member of the Technical Staff. Beginning a year or more prior to his employment, Kothawala and SDRC had discussed this possibility. SDRC wished to open a Detroit office and Kothawala desired a managerial position in a Detroit-based company which he would wholly or partially own. When Kothawala was hired, both parties anticipated that he would assume management responsibility for an SDRC office in Detroit but the details were left for future resolution. It was agreed that Kothawala would spend six to twelve months in Cincinnati to familiarize himself with SDRC's business and procedures.

Hildebrand was also hired in August of 1972 on Kothawala's recommendation. It was anticipated that he would also be involved in the Detroit office.

In August of 1972, shortly after Kothawala started working at SDRC, Surana showed him the results of his investigation concerning an isoparametric element computer program. Kothawala arranged to have Surana's conclusions reviewed by the Technical Staff.

A meeting of the Technical Staff was held on August 14, 1972. Surana explained to them what he had been doing with respect to isoparametric elements and the advantages he believed a program containing such elements would have over one containing conventional elements. At the conclusion of the meeting, this group gave Surana authority to devote all of his time to develop such a program and assigned to Kothawala and Surana responsibility for drafting a formal written proposal. Kothawala was eventually assigned supervisory responsibility for the project.

On August 23, 1972 Kothawala and Surana submitted a formal proposal. It stressed the importance of the proposed program to SDRC, the advantages and superiority of isoparametric elements, the significance of Surana's technical work to date and the uniqueness of the program. It also contained cost estimates and a timetable for completion. SDRC relied on these representations since no one employed by SDRC at this time other than Surana had any significant knowledge of isoparametric element theory or application.

On October 25, 1972 Kothawala and Surana issued a technical status report. Surana had developed the program to the point of running test problems. Kothawala stated that the program would "revolutionize" SDRC's problem solving ability. SDRC management felt this report established the feasibility of the program.

Surana continued his work on the program throughout the rest of the year. He named the program "NIESA", an ac-

ronym for "Numerically Integrated Elements for System Analysis".

During this period Kothawala submitted several plans for opening a Detroit office. These plans were not satisfactory to SDRC and led it to conclude that Kothawala lacked the business experience to assume full management responsibility. After a number of discussions with Kothawala, SDRC submitted a proposal on December 21, 1972 in which the Detroit entity would combine technical consulting and sales activities with Kothawala responsible for the former as a member of the Technical Staff, but reporting to management in Cincinnati. The offer included an increase in salary which would have made Kothawala the second highest paid employee in the company.

On December 28, 1972 Kothawala responded that, while the offer was attractive, he found it unsatisfactory. He requested to be released from his contract effective January 1, 1973. SDRC released him from the contract except for the provisions pertaining to post-termination activities. Kothawala returned to Detroit and established EMRC.

Hildebrand also gave SDRC notice of immediate resignation. He declined SDRC's offer to continue as a project engineer. Instead, he also returned to Detroit and began to work for EMRC as Manager of Applications.

On January 9, 1973 Surana gave notice of his resignation. He refused to reconsider but was persuaded to stay for a brief period during which he prepared a handwritten description of the program's status and he explained the program to other SDRC employees.

Surana at first apparently intended to obtain a university position. However, in late February of 1973 he began to work for EMRC. On March 1, 1973 he was formally hired as Vice President of Engineering at EMRC.

Shortly after Kothawala arrived back in Detroit, he called upon American Motors Corporation (AMC). He had learned of its interest in acquiring structural analysis programs while employed by SDRC. On January 10, 1973 he proposed to develop for AMC a conventional, non-isoparametric, finite element program.

Then, on February 27, 1973, before AMC had acted on this proposal, Kothawala and Surana, who had now joined EMRC, submitted a new proposal for an isoparametric program substantially the same as NIESA in design, element library, solver and basic capabilities. Their proposal repeated the representations made to SDRC as to the uniqueness, superiority and value of an isoparametric element program. The written materials contained a number of paragraphs and a drawing taken from Kothawala's and Surana's August 23, 1972 formal proposal to SDRC.

In order to prepare a recommendation to its management, AMC personnel asked questions regarding specifics of the proposal. Kothawala responded by an undated letter. It is apparent from a comparison of the undated letter with the recommendation of Joseph Balnave, manager of AMC's computer center, written in mid-March, that the undated letter was written between February 27 and mid-March, since Balnave's recommendation of mid-March contains many of the specifics set out in the undated letter. In the undated letter Kothawala stated that the program being offered to AMC was partially finished, 1200 hours having been spent on it already and only 500 hours remaining for completion. Since defendants had not commenced working on the program at that time, it is clear that Kothawala offered American Motors the benefit of the time spent by him and Surana at SDRC. The partially finished program thus is SDRC's NIESA.

In March of 1973 EMRC commenced program development under an informal arrangement. In June formal approval for the funding of the program was obtained from AMC management. The program was completed about November

1, 1973. At that time Kothawala furnished AMC with certain program documentation which he stated was confidential and the property of EMRC. He instructed AMC to keep all aspects of the program in confidence in order to prevent any copying of the documents or program. He also refused AMC's request for a copy of the program code on grounds of confidentiality.

EMRC continued development of the program and added additional capabilities. In February of 1974 EMRC began marketing its program under the name "NISA", an acronym for "Numerically Integrated Elements for System Analysis".

SDRC, previously unaware of defendants' development activity, speeded up its own development work on NIESA. NIESA, renamed SUPERB, was placed on the market in April of 1974.

NISA and NIESA-SUPERB are very similar programs. The basic difference between them is that NISA is more fully developed, having the additional capacity to perform dynamic and heat conduction analysis.[3] These additional capacities were included in Kothawala's and Surana's plan for the development of NIESA at SDRC. Thus, NISA is in a sense the implementation of the plan for development of NIESA.

Mention must also be made of the Ford Door Project. While this is an element of the damages claimed, the court places particular emphasis on what these events reveal as to Kothawala's character and credibility. Since the testimony presented by plaintiff was often directly contrary to that of Kothawala, credibility is extremely important.

Shortly prior to the hiring of Kothawala and Hildebrand, SDRC bid successfully for an experimental testing and analysis project involving a vehicle component of the Ford Motor Company (Ford). Kothawala was assigned supervisory responsibility for the project and Hildebrand was designated project engineer.

Beginning in about November, 1972 Kothawala advised Ford employees having responsibility for the project regarding his lack of success in obtaining a satisfactory arrangement for the Detroit operation and indicated that he might resign from SDRC. These communications continued in an increasingly pessimistic vein until Christmas when Kothawala advised these Ford employees of his intent to resign. Kothawala's statements to Ford regarding prospective and actual resignation preceded his notice to SDRC. With increasing intensity as the end of the year approached, Kothawala created concern on the part of the Ford employees while expressing willingness to assume personal responsibility for completion of the project. Kothawala further led Ford employees to believe that the project could not be completed in a timely and efficient manner by SDRC through the use of other employees. By these actions Kothawala intentionally caused concern at Ford for the future of the project and doubt as to SDRC's ability to perform without Kothawala. The Ford employees assumed that SDRC was aware of the prospect of Kothawala's resignation and felt that SDRC was amiss in failing to communicate with them regarding this contingency.

At about the time of their letters of resignation and while still employed by SDRC, Kothawala and Hildebrand collaborated in the preparation of a letter to Ford critical of SDRC's rate structure and working conditions. The clear intent of the letter was to downgrade SDRC and to persuade Ford to transfer the project from SDRC to Kothawala and Hildebrand. Kothawala admittedly requested an SDRC secretary to type the letter but instead she turned it over to SDRC management. The letter was completed and delivered to Ford by Kothawala on January 4, 1973 at which time

---

3. NISA's program is usable on different kinds of computers. This was not so as to the NIESA program. In this sense the NISA program is "machine independent".

Kothawala reiterated his request that Ford transfer the project. In spite of this letter to Ford, Kothawala indicated to SDRC in a letter of January 15, 1973 that the Ford project was in excellent condition and that Kothawala and Hildebrand's presence was not necessary for completion of the work.

With these facts before us we turn to the plaintiff's contentions.

## II.

Plaintiff ·SDRC makes three basic arguments:[4]

(a) Breach of trust on the part of the individual defendants (formerly employees of plaintiff) who used for their own advantage trade secrets owned by plaintiff and acquired by the individual defendants in a confidential relationship with plaintiff;

(b) Breach of contractual duty not to use or disclose confidential information;

(c) Unfair competition.

The law of trade secrecy is bottomed on the theory that in certain relationships a general duty of good faith exists owing by one person to another and that liability results because of a breach of this duty. Section 757 of the *Restatement of the Law of Torts* provides the rationale: there is a privilege to compete with others; this includes a privilege to adopt business methods, ideas or processes of manufacture. But limits on competition are necessary to protect the originator of the idea and so advance the progress of science and the useful arts. Thus the patent law prohibits infringement of a patent granted to another and the tort law "prohibits copying the things of another in a manner which creates in the market avoidable confusion of commercial source". The *Restatement, supra,* points out that

one who discloses or uses another's trade secret, without privilege to do so, is liable to the other if "(a) he discovered the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence . . ." (*Restatement, supra,* at 1, 2).

A review of the case law indicates considerable overlap in the application of these principles. In an article entitled *Developments in the Law—Competitive Torts,* 77 Harv.L.Rev. 888, 948–49 (1964), a summary appears. It discusses the requirements: "the discoverer[5] must prove that the taking involved improper conduct; that the information was in fact substantially secret and that reasonable efforts were made to keep it so; and that the defendant knew or should have known of the improper taking".

In any consideration of the policy underpinning the law of trade secrecy one is aware of the need that useful knowledge should be disclosed. In open societies such as ours this need is clearly recognized. It may be that in controlled societies one reason for the apparent lack of development of technology is the restriction on disclosure. But it is also true that some protection favors innovation and that this encouragement to a discoverer or developer enhances a basic human motivation for inventiveness.

What is the law and its policy as to an employee who is himself the discoverer or developer of a claimed trade secret? Here one argument is that such an employee's skill, experience and knowledge should be protected. Some scholars point out (77 Harv.L.Rev., *supra,* at 949) that relief [to a former employer] "may be denied in cases where the secret has become such an important part of an employee's job skills that he will have difficulty in obtaining a new position if he cannot take it with him". They say that courts should balance the

---

4. Plaintiff's contention that defendants interfered with its customer relations and that EMRC acted conspiratorially is dealt with elsewhere in this opinion.

5. "Discoverer" here refers to the person to whom the protection is due.

competing interests. In *Manos v. Melton*, 358 Mich. 500, 100 N.W.2d 235 (1960) one court did so and concluded that defendant Melton, an experienced plater, was not to be enjoined from using his knowledge and skill in subsequent employment with plaintiff's competitor. It appears he did disclose valuable techniques to his new employer which he and plaintiff Manos had developed earlier while associated together in business. The court not only found that the techniques were not of sufficient originality so as to be trade secrets, but it also rested its decision on the point that this was a part of Melton's skill and knowledge. It noted that Melton had specifically excluded this matter of his skill from incorporation into a non-competition clause in a contract by which he sold his stock in the business to his former associate, Manos.

*Manos* may well state a current area of concern for the technically skilled employee. The authors suggest that "both industrial society and the employee have an interest in preserving the job mobility of technically skilled employees, who will be less attractive to new employers so far as their acquired skills and knowledge are regarded as trade secrets".[6] They go on to suggest a second reason, that "if the employee has himself helped to develop the trade secret, this also weighs against protection [to his employer], since he may have some claim to ownership himself". 77 Harv.L.Rev., *supra* at 951.

In this case Surana and Kothawala did not obtain the claimed trade secrets through improper means. In substantial measure they were the developers and innovators of a general purpose isoparametric computer program. They were hired by SDRC for research and development activity in this very field, and the manner of their acquisition of knowledge of this technology can in no sense be said to have been obtained improperly.

Does their subsequent use or disclosure of this technology, assuming it to be a trade secret, breach a duty of trust owed by these individual defendants to plaintiff? The *Restatement, supra*, at 4, suggests this question by its comment: "apart from breach of contract, abuse of confidence or impropriety in the means of procurement, trade secrets may be copied as freely as devices which are not secret".

The relationship giving rise to a duty is not necessarily dependent upon contract; it may be based on agency principles or on specific dealings between parties in which a situation of trust arises and out of which sought-to-be-protected knowledge is acquired. Vital to a consideration of the creation of duty in such situations is the key question as to how the person acquiring such trade secret knowledge obtained it. If the subject matter of the trade secret is in being and an employee learns about it in the course of his employment in a relationship of confidence, the duty not to use or disclose trade secret knowledge adversely to his employer arises. On the other hand, if the subject matter of the trade secret is brought into being because of the initiative of the employee in its creation, innovation or development even though the relationship is one of confidence, no duty arises since the employee may then have an interest in the subject matter at least equal to that of his employer or in any event, such knowledge is a part of the employee's skill and experience. In such a case, absent an express contractual obligation by the employee not to use or disclose such confidential information acquired during his employment adverse to his employer's interest, he is free to use or disclose it in subsequent employment activity.

In *Wexler v. Greenberg*, 399 Pa. 569, 160 A.2d 430 (1960), the Pennsylvania Supreme Court held that in the absence of a contractual obligation not to use or disclose, no duty arose from the employ-

---

6. *See* 77 Harv.L.Rev., *supra*, at 951.

ment relationship itself that would prevent a chemist from using and disclosing secret chemical formulae developed by him in the course of his former employment. The court distinguished the cases in which an employer discloses to his employee a preexisting trade secret from those in which the employee himself develops the trade secret sought to be protected. A further distinction was then drawn within the category of employee-developed secrets. Where the employer assigns the employee to a specific development task and commits considerable resources and supervision to the project, a confidential relationship arises that prevents the employee from using or disclosing the fruits of his research. When, on the other hand, the developments are the product of the application of the employee's own skill, "without any appreciable assistance by way of information or great expense or supervision by [the employer], outside of the normal expenses of his job", 160 A.2d at 436, he has "an unqualified privilege" to use and disclose the trade secrets so developed. 160 A.2d at 437. *Accord, New Method Die & Cut-Out Co. v. Milton Bradley Co.*, 289 Mass. 277, 194 N.E. 80, 82 (1935) (defendant employee not required to maintain secrecy where he "took part to a substantial extent in developing the process", but "was not employed specifically for this purpose".)

While the question is concededly a close one, the court holds that the isoparametric program developed on the initial encouragement—and under the supervision—of Surana and Kothawala falls within the latter category.

Surana and Kothawala do not owe SDRC a duty not to use or disclose its trade secrets by reason of a relationship of confidence in employment. As the substantial developers and innovators of this technology they have an interest in it and unless they expressly contracted with SDRC not to use or disclose such knowledge or information in future employment activity, there is no duty imposed upon them by reason of

their employment relationship with SDRC. Nor is such a duty created by any equitable doctrine of quasi-contract; i. e., a contract implied in law.

Accordingly, the court turns to the remaining question. Are there obligations imposed on the individual defendants not to use or disclose confidential information acquired in and during the course of their employment at SDRC because of express contractual agreements into which they entered?

### III.

Here, all three individual defendants entered into an Employee Patent and Confidential Information Agreement. In it they agree:

"(d) At no time either during his employment, on either a part or full-time basis with the Company or subsequent to termination of such employment will Employee divulge to any person, firm or corporation, or use (other than as required by the Company in the course of his employment) any privileged or confidential information, trade secret or other proprietary information including but not limited to information relating to the experimental and research work of the Corporation, its methods, processes, tools, machinery, formulae, drawings, or appliances imparted or divulged to, gained or developed by or otherwise discovered by Employee during his employment with the Company."

\* \* \* \* \* \*

"(f) Employee will not during the term of his employment directly or indirectly enter into employment or render services to any person, firm or corporation rendering services or handling products competitive with the Company's services or products or engage as a principal in any such business, and for a further period of six (6) months following the termination hereof, engage as a principal in any business of or with any person, firm or corporation in the United States, one of the major business activities of

which is to render services or handle products competitive with the services or products of the Company. To engage as a principal in any business, as used in this paragraph, is defined as owning or having a contractual right to own in the future a profit sharing interest of 5% or more of any such business entity, or acting as an officer, manager or other comparable executive position or serving on the Board of Directors or similar governing body of said entity."

Kothawala also executed a separate employment contract. He himself drafted some of its terms. SDRC had submitted a proposed contract to him. He found it unacceptable, insisted on modifications and then submitted his draft which was executed. It contains the following provisions:

"1. Commencing with the date of this contract and continuing for two (2) years thereafter, Kothawala will devote his entire business time, skill, labor and attention to this employment and will not participate as a consultant, or as a part-time employee in any other business during such time except with the express written permission of SDRC. The services which he will perform for SDRC will be those which are prescribed by SDRC. Such services will be performed in such locations as may be required. Kothawala will not for a period of one (1) year after his termination hereunder directly, or indirectly enter into employment or render services to any person, firm or corporation, which, as one of its business activities, engages in competition with SDRC or distributes products in substantial competition with SDRC anywhere in the United States, nor will Kothawala enter into or become interested in any such competitive business as a principal, which for the purposes of the contract, is defined as owning or controlling in excess of 3% of the capital stock or other earning-sharing interest in any such business."

\* \* \* \* \* \*

"4. Neither during the period of employment nor at any time thereafter will Kothawala disclose to anyone any confidential information or trade secrets concerning the business affairs of SDRC, including but not limited to information relating to the experimental and research work of SDRC, their methods, processes, tools, machinery, formulae, drawings, or appliances imparted or divulged to, gained or developed by or otherwise discovered by Kothawala during his employment with SDRC. Upon termination of his employment, Kothawala will return to SDRC all objects, materials, devices or substances including notes, records, drawings, sketches, recordings, descriptions, samples, specimens, prototypes, models, blueprints, analyses, programs, or the like, and including any facsimile, replica, photograph or reproduction thereof, belonging to SDRC or relating to their respective business."

These contracts were entered into in Ohio.

The agreements not to disclose confidential information impose obligations by their clear terms since these undertakings do not exclude information, technology or knowledge which the employee himself discovers, develops or contributes. *See Winston Research Corp. v. Minnesota Mining and Manufacturing Co.*, 350 F.2d 134, 140 (9th Cir. 1965). Thus, if the contracts are valid and enforceable, defendants are under obligations not to use or disclose confidential information gained while employed at SDRC.

Some courts have held that such express contracts create a confidential relationship between employer and employee, breach of which results in liability. They use the doctrine of trade secrets in the decisional process. This court finds such an approach too restrictive, especially in an area of knowledge and rapid technological change such as the computer field.

The express contracts in issue apply not only to trade secrets but also to privileged, proprietary and confidential information. In this they are analogous to the breadth of coverage recognized under agency principles. In *Shwayder Chemical Metallurgy Corp. v. Baum*, 45 Mich.App. 220, 206 N.W.2d 484 (1973) it was held that while the process plaintiff sought to protect was not a trade secret, defendant stood in a fiduciary and confidential relationship to plaintiff, that he breached the duties and obligations arising from that relationship and was therefore liable for damages. *See Restatement (Second) of Agency* §§ 395 and 396.

■ These considerations apply to the express contracts in issue. Defendants are liable for breach of their contracts and are answerable in damages if they used or disclosed confidential information, knowledge or technology gained while employed at SDRC. This is so even though such information, knowledge or technology is not itself a trade secret. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 498–99, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), dissenting opinion of Justice Douglas.

■■ The contracts in issue are valid *in toto* if governed by Ohio law and valid in part if severable under Michigan law.[7] Ohio permits its courts to enforce covenants not to use or disclose confidential information as well as reasonable covenants not to compete. *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544 (1975). In Michigan a statute, M.C.L.A. 445.761, declares that covenants not to compete, whether reasonable or unreasonable, are against public policy and are illegal and void. Michigan, however, does recognize and enforce covenants not to use or disclose confidential information. *Glucol Manufacturing Co. v. Schulist*, 239 Mich. 70, 214 N.W. 152 (1927).

■ Whether Michigan or Ohio law applies is a question of conflict of laws. A United States District Court in exercising diversity jurisdiction must follow the forum state's rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941). Michigan follows the general rule expressed in the *Restatement of Conflict of Laws* § 332 that the nature, validity, effect and obligation of a contract are governed by the law of the place where the contract was made. *Keehn v. Charles J. Rogers, Inc.*, 311 Mich. 416, 18 N.W.2d 877 (1945); *Waldorf v. KMS Industries, Inc.*, 25 Mich. App. 20, 181 N.W.2d 85 (1970).

There does not seem to be any dispute as to the place of the making of the contracts and in any event the court finds that they were entered into in Ohio.

■ Michigan has also adopted an additional rule, a departure from the *Restatement*,[8] that the validity of a contract made in one state but intended by the parties to be performed in another state is governed by the law of the place of performance. *George Realty Co. v. Gulf Refining Co.*, 275 Mich. 442, 266 N.W. 411 (1936).

Defendants assert that this rule controls. They argue that the evidence regarding the proposed establishment of a Detroit business entity indicates that the parties intended Michigan to be the place of performance. This argument has some merit as to Kothawala and possibly Hildebrand, but fails to include Surana, the principal developer of NISA, since he was never involved in the proposed Detroit entity.

This argument also ignores the nature of the performance required by the contracts. The parties intended that defendants would refrain from using or disclosing confidential information in the several states in which SDRC did business including Ohio and Michigan.

---

7. The court does not reach this issue of severability due to its resolution of choice of law principles governing validity.

8. *See* Restatement of Conflict of Laws § 358.

Ohio is as much the place of performance as Michigan since the parties did not focus on any state in particular as the place of performance. Thus this Michigan rule would not be applicable.

In this type of case, where the place of performance is not focused in any particular state, courts have held that in the absence of evidence to the contrary, the parties intended that the law of the place where the contract was made should govern questions of validity.[9] *St. Regis Paper Co. v. Stuart,* 214 F.2d 762 (1st Cir. 1954), *cert. denied,* 348 U.S. 915, 75 S.Ct. 296, 99 L.Ed. 717; *Illinois Central R. R. Co. v. Beebe,* 174 Ill. 13, 50 N.E. 1019 (1898); *Oakes v. Chicago Fire Brick Co.,* 388 Ill. 474, 58 N.E.2d 460 (1945); *Larx Co. v. Nicol,* 224 Minn. 1, 28 N.W.2d 705 (1949); *General Accident Fire & Life Assurance Corp. v. Ganser,* 2 Misc.2d 18, 150 N.Y.S.2d 705 (Sup.Ct.1956).

■ This being so, the law of Ohio would govern questions of validity. A number of factors indicate this to be the correct result: (a) It is in accord with principles stated in the *Restatement of Conflict of Laws* which were recently so forcefully upheld in Michigan in the area of torts. *Abendschein v. Farrell,* 382 Mich. 510, 170 N.W.2d 137 (1969). (b) The contracts in issue were made, executed and delivered in Ohio. (c) It would further the presumed intent of the parties, in accordance with traditional contract doctrine, to enter into a valid contract. (d) The employment relationship arose and centered in Ohio. (e) The defendants acquired the confidential information while employed at SDRC's principal place of business in Ohio.

■ The extent to which an Ohio contract will be enforced in Michigan

depends upon the doctrine of judicial comity. *McColl v. Wardowski,* 280 Mich. 374, 273 N.W. 736 (1937). Defendants argue that even though the contracts are valid where made, the inclusion of a non-competition clause in each, void under M.C.L.A. 445.761, invalidates the contracts and precludes their enforcement.

■ This court is unable to perceive any reason why contracts, valid *in toto* where made, should not be enforced as a matter of comity to the extent their provisions do not contravene the public policy of the forum. In *Glucol Manufacturing Company v. Schulist,* 239 Mich. 70, 214 N.W. 152 (1927) the Michigan Supreme Court, in discussing the enforceability of non-disclosure provisions, stated:

> "But we agree with the trial court that this statute [M.C.L.A. 445.761] has no application in the instant case. The reason is obvious. Defendant did not agree not to engage in a similar business, but only that he would not use the formulae of his employer, which, he was given to understand, were the property of plaintiff." 239 Mich. at 74, 214 N.W. at 153.

*See O. & W. Thum Co. v. Tloczynski,* 114 Mich. 149, 72 N.W. 140 (1897).

■ The public policy of Michigan does not preclude enforcement of use or non-disclosure provisions. The presence of the non-competition provision, while itself unenforceable, does not make the other logically distinct and separate provisions of these contracts unenforceable when these provisions, standing alone, are valid in both states.

This brings the court to the issue of breach.

---

9. The court is unable to find any Michigan authority on this point. However, the factual background of a number of decisions of the United States Court of Appeals for the Sixth Circuit dealing with cases arising in Michigan, which hold that the lex loci contractus controls questions of validity, suggests Michigan follows this rule. *See Transit Bus Sales v. Kalamazoo Coaches,* 145 F. 2d 804 (6th Cir. 1944); *M. W. Zack Co. v. R. D. Werner Co.,* 222 F.2d 634 (6th Cir. 1955); *Sheerin v. Steele,* 240 F.2d 797 (6th Cir. 1957), *cert. denied,* 353 U.S. 938, 77 S. Ct. 816, 1 L.Ed.2d 760. The later case cites *St. Regis Paper Co. v. Stuart,* 214 F.2d 762 (1st Cir. 1954), *cert. denied,* 348 U.S. 915, 75 S.Ct. 296, 99 L.Ed. 717, which clearly follows this rule.

██ It is true that initial recognition of the importance of isoparametric elements in a new program, and the feasibility of development of such a program, must be credited to Surana and, to a lesser extent, to Kothawala. However, this information was acquired in the course of their employment and a fulfillment of their specific assigned responsibilities. This information had business value and SDRC had the sole right because of the express contracts to exploit the advantage. SDRC's possession of this information gave it an opportunity to gain an advantage over its competitors who did not have the information. The August 23, 1972 proposal by Kothawala is a significant compilation of marketing and technical planning for the program and this document was therefore proprietary and confidential. The court finds that SDRC relied on the representations of Kothawala and Surana including those contained in the August 23, 1972 document in its decision to devote its resources to the program. SDRC reasonably anticipated that part of its business advantage would flow from its early entry in the market—an advantage recognized by both sides. SDRC did not anticipate that the very employees who extolled the merits of the program and caused SDRC to undertake its development would use the same information to develop a competitive product and achieve the advantage of being first in the market. These actions by defendants breached their contractual obligations not to use or disclose confidential information.

██ The technical planning and development of NIESA to its stage of development in January, 1973, including the selection of elements, solver routine, organization of sub-routines, coding, and other factors contributing to the efficiency and effectiveness of the program constituted important and confidential information, particularly prior to public release of the program. The technical accomplishments of Surana and Kothawala reflected in their work on NIESA amounted to a compilation of information which gave SDRC a competitive advantage. The existence or availability of abstract technical data does not detract from the confidentiality of the combination of such parts and data into a program of the type under consideration. This was conceded by Kothawala and confirmed by defendants' actions in dealing with the trade when great emphasis was placed by the defendants on the confidential nature of the NISA program and the competitive importance to EMRC in protecting such confidentiality.

██ The status report prepared for SDRC by Kothawala and Surana in October includes such information and it is likewise confidential and proprietary. This information had value and was confidential to SDRC. Surana's use of this information for defendants' benefit was a breach of his contract. This also holds true with respect to Kothawala who hired Surana and participated in the unlawful use of information obtained at SDRC, and who, as sole shareholder of EMRC, is presently the primary beneficiary of the illicit information.

██ Confidentiality of information can be determined from the manner in which defendants themselves treated the information prior to the litigation. *See A. O. Smith Corp. v. Petroleum Iron Works Co.*, 73 F.2d 531 (6th Cir. 1934); *Fairchild Engine v. Cox*, Sup., 50 N.Y. S.2d 643 (1944); *Materials Development Corp. v. Atlantic Materials, Inc.*, 172 U.S.P.Q. 595 (Mass.1971). Here the record is replete with statements by the defendants both to SDRC and to AMC as to the value, uniqueness and confidentiality of the program.

A quantity of documents belonging to SDRC were also found in possession of defendants when this action was commenced. These included:

Internal SDRC documents pertaining to work on the Ford Door Project.

Internal SDRC documents pertaining to the NIESA program including the

August 23 and October 25 documents, customer information and prospective research and development activities.

Surana's notes prepared as part of his development work on NIESA. The court finds these notes to have significant value both in the case of NIESA and NISA.

The court does not credit defendants' explanation that these documents were permitted to be taken from SDRC's office. The court finds that they were taken without permission.

At a pretrial conference the court directed defendants to make a copy of the static portion of the NISA code available to plaintiff's counsel and experts pursuant to a protective order. The code which was furnished was dated December, 1974, and reflected many revisions made subsequent to defendants' initial code. Defendants have represented that no prior version of the NISA code remained. Portions of the NISA code were compared to the NIESA code as it existed in January, 1973. On the basis of this comparison, plaintiff's experts, Dr. Anderson of the Department of Aerospace Engineering at the University of Michigan, and Michael Coble, a computer programmer also affiliated with the University, concluded that defendants must have copied from the NIESA code. They made a careful analysis of the two programs and found not only similarity in the overall structure and organization (some of which might be explainable on functional grounds) but they found identical segments of code which were solely arbitrary and, most significantly, deviations or quasi-mistakes which, in their judgment, could only be explained by copying. Victor Nicholas, who completed the development of NIESA-SUPERB at SDRC, testified that the input data cards prepared by Surana for NIESA were taken verbatim into NISA. Except for cross-examination, defendants did not address these specifics relied on by the experts, but attributed such similarities as existed to Surana's memory. The court does not accept this explanation. Memory alone cannot explain the specifics which according to the experts do not make sense but are explainable only by copying. The court finds that defendants copied from the physical NIESA code.

■ The technical and business information which the court has found to have been misappropriated by defendants was treated by SDRC in a manner consistent with the preservation of its confidentiality. Although SDRC did not use the ultimate in policing measures, the professional calibre of its employees, and the nature of its development work made heavy-handed measures unnecessary. Moreover, the confidential nature of development work was specifically called to each employee's attention in his individual confidential disclosure agreement. The court finds that defendants Kothawala and Surana knew that information pertaining to NIESA was confidential and proprietary to SDRC.

■ SDRC did not disclose confidential information to outside parties in a manner inconsistent with preservation of confidentiality. To the extent that limited disclosure may have been made to representatives of United States Steel Corporation, that company's relationship to SDRC as its largest shareholder and a business partner was not inconsistent with the preservation of confidentiality.

■ The defendants' main legal defense was that all the information which is included in a computer program such as NIESA is found in the literature and therefore the NIESA program was not unique, was not novel, was not an invention and could not rise to the level of protectable confidential information and/or trade secrets. The court disagrees with the defendants' position. An overwhelming majority of authorities on the subject have ruled that novelty and uniqueness are not a requirement for trade secret protection. *W. R. Grace & Co. v. Hargadine*, 392 F.2d 9 (6th Cir. 1968); *Allis-Chalmers Manufacturing*

Co. v. Continental Aviation and Engineering Corp., 255 F.Supp. 645 (E.D. Mich.1966); Water Services, Inc. v. Tesco Chemicals, 410 F.2d 163 (5th Cir. 1969), and Restatement of Torts § 757, Comment B; University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518 (5th Cir. 1974); Bickley v. Frutchey Bean Co., 173 F.Supp. 516 (E.D. Mich.1959), aff'd per curiam, 279 F.2d 685 (6th Cir. 1960); cf. Com-Share Inc. v. Computer Complex, 458 F.2d 1341 (6th Cir. 1972). These principles apply with equal force to contractual provisions not to disclose or use confidential information. It is unnecessary for the court to determine whether all the ingredients making up the NIESA program and the NISA program are found in the literature, for the combining of all the essential elements into a program which is primarily and exclusively an isoparametric element program was and is a unique and valuable program in the software industry and is within the definition of confidential information.

The court has held that the NISA program of EMRC was developed through the use of the plaintiff's confidential information regarding the NIESA-SUPERB projects. The fact that the NISA program is at a later stage of completion than the status of NIESA at the time that Surana left SDRC or the fact that EMRC may have modified and added additional capabilities than those existing at the time that Surana left is not a defense to this action. There is not requirement that the defendants use the information in exactly the form in which they received it. Furthermore, the court finds that the later stage of development of NISA is directly attributable to the head start that the use of SDRC's confidential information gave to EMRC in its pursuit of the NISA project.

The defendants also contend that SDRC breached its contract of employment with Kothawala by not offering him a job as the manager of an SDRC office in Detroit, and that this breach entitled defendants to use whatever information they had in regard to the NIESA-SUPERB program in developing the NISA program.

The court finds that SDRC acted in good faith in an effort to accommodate their business interests with Kothawala's ambitions and the pertinent provisions of the contract. SDRC did not guarantee Kothawala a management position at any time and certainly not within five months of the execution of the contract.

Finally, the court finds that EMRC, the corporation of which defendant Kothawala is sole shareholder, is the entity through which this confidential information is being purveyed in the marketplace; it is liable with the individual defendants for agreeing with them to carry out this improper purpose.

In view of these findings, it is unnecessary to consider plaintiff's contention as to unfair competition.

## IV.

On the Ford Door Project Kothawala and Hildebrand are liable for interference with SDRC's customer relations. Their acts in disparaging SDRC's ability satisfactorily to complete the project were the direct cause of Ford's transfer of the project from SDRC to EMRC. Under Michigan law, "an action for damages lies against one who is not a party to a contract but who wrongfully induces a breach or termination thereof". Wilkinson v. Powe, 300 Mich. 275, 1 N.W.2d 539 (1942).

The SDRC contract provided for payment to it in the total amount of $47,530. Ford paid SDRC $31,993 for its portion of the work prior to transfer. The balance of $15,337 was paid to EMRC. SDRC's normal profit factor, which the court finds reasonable and appropriate for determining damages on this project, is 20% of $15,337, or $3,107. Kothawala, Hildebrand and EMRC are jointly and severally liable to SDRC for this loss of profit.

SDRC is also entitled to damages for breach of the express contracts. In *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974), the court considered in detail the approaches used in this area. It concluded that when a defendant had destroyed the value of the information, courts generally attempted to measure the loss suffered by the plaintiff. However, when the secret had not been destroyed, as here, courts attempted to measure the value of the secret to the defendant. This value is measured by the "reasonable royalty" standard. In explaining the standard, the court stated:

"[T]he type of measure [of damages] used by the Court, based on actual sales, has taken many different forms. As the term is presently understood, the 'reasonable royalty' measure of damages is taken to mean more than simply a percentage of actual profits. The measure now, very simply, means '[t]he actual value of what has been appropriated'. *Vitro Corporation of America v. Hall Chemical Co.*, 292 F.2d 678, 683 . . . (6th Cir. 1961). When this is not subject to exact measurement, a reasonable estimate of value is used." *University Computing Co. v. Lykes-Youngstown Corp., supra*, at 537.

▮ Here the court notes that defendants have not made a profit. However, this does not preclude SDRC from recovering damages, for when defendants misused confidential information as outlined herein, they bore this risk of failure and must refund for their breaches. *University Computing Co. v. Lykes-Youngstown Corp., supra; Vitro Corporation of America v. Hall Chemical Co.*, 292 F.2d 678 (6th Cir. 1961).

▮ In determining the measure of damages the court should consider the commercial setting of the injury, the likely future consequences of the breach and the nature and extent of the use.

Here EMRC is in direct competition with SDRC in the development and transfer on a commercial basis of computer software and specifically EMRC's offering of its NISA program in competition with SDRC's SUPERB program. EMRC, in offering its NISA program to the market, is offering a computer program which had been planned and partially completed at SDRC; additionally, EMRC used extensive confidential information regarding SDRC's NIESA program in developing NISA. EMRC is using SDRC's confidential information for:

(a) Internal solution of its customers' scructural problems which is known in the trade as applications work; and

(b) Transfer, on a commercial basis, of the program for use by third parties either on an in-house or vendor installation basis.

These uses are without SDRC's permission and without compensation to SDRC. Additionally, EMRC was successful in transferring the use of NISA to a number of potential SDRC customers. The court finds that NISA and SUPERB are so similar that if a customer had NISA it would not need SUPERB. Accordingly, SDRC has been damaged and this same type of competition presently continues.

SDRC submitted evidence of the prices it currently charges to its customers and the profit factors SDRC generally experienced in these lines of business. While the court does not doubt that they are reasonable, it finds the profit factor of 20% used by SDRC to be too high for this purpose. The reason is that, while defendants went so far in their misuse of SDRC's confidential information as to copy from NIESA, they also used in some measure their own skill, knowledge and experience in completing the development of NISA. NIESA was only partially completed at the time defendants left SDRC. The evidence does not reveal that any significant work had been done on the dynamic or heat conduction analysis capabilities of NIESA. At EMRC, defendants completed the work on the static analysis ca-

pability of NIESA and then added the additional capabilities described above.

■ The court finds that while defendants used their own experience, skill and knowledge, this was commingled with the confidential information taken from SDRC. Since the defendants through their own actions placed themselves in this position, the court finds that (a) SDRC is entitled to a recovery of a percentage of all EMRC's sales; (b) a "reasonable royalty" in this case is 15% of EMRC's gross sales; (c) this will include, but is not limited to EMRC's use of NISA for the internal solution of its customers' structural problems and use of the program by EMRC's customers on an in-house or vendor installation basis.

This royalty is imposed for the period of time necessary for a competitior to duplicate the program by independent research rather than through the use of confidential information. SDRC presented expert testimony that this period would be two and one-half to four years. The court finds that three years is a reasonale period and will adequately protect SDRC. The period shall begin to run from the time defendants first used SDRC's confidential information. This occurred when they began developing NISA at AMC. The testimony indicated that defendants began its program informally with AMC in mid-March, 1973 and received formal approval in June of 1974. The court concludes that the period for which such damages as herein defined may be collected shall be calculated from March 15, 1973 and continue to March 15, 1976.

SDRC also seeks a license fee of $45,000 for use of its program on an in-house basis by EMRC and AMC for which there are no billings or sales figures. EMRC was permitted the use of AMC's computer facilities free of charge for program development and independent commercial use in return for which EMRC supplied AMC its NISA program without charge.

Ordinarily, an estimate of a reasonable billing could be made from evidence of the expenditures EMRC incurred for development of NISA. EMRC asserted that it had spent $96,986 for salaries of EMRC personnel, $2,145.88 for other expenditures and $223,000 for use of AMC's computer facilities for a total of $322,131.88.[10] But this is not a completely realistic measure due to unusually high start-up costs. The court concludes that SDRC's license fee, which is reasonable, provides a sounder basis for the award of damages. Therefore, the court concludes that EMRC is also liable to SDRC for $45,000 for the installation of NISA at AMC.

No injunction will be issued since the court finds that compensatory damages are an adequate remedy.

Accordingly, the court herein enters judgment for compensatory damages in favor of the plaintiff as follows:

(a) Defendants EMRC, Kothawala and Hildebrand are jointly and severally liable for plaintiff's loss of profits from the termination of the Ford Door Project which the court has found to be in the amount of $3,107.

(b) Defendants EMRC, Kothawala and Surana are jointly and severally liable for their unauthorized use of SDRC's confidential information in the NISA program for damages of 15% on all sales of EMRC for a period of three years as hereinbefore defined, and additionally for damages of $45,000 as heretofore stated.

Costs to be taxed.

An appropriate order may be presented.

If the court's aid or further discovery is needed to determine gross sales for the period from March 15, 1973 to date and from date to March 15, 1976, application therefor may be timely made.

10. Defendants' Response to Request 10 of Plaintiff's Supplemental Rule 34 Request for Production of Documents.