Thomas N. MELIN and Virginia
W. Melin

v.

The UNITED STATES.

No. 53–71.

United States Court of Claims.

May 11, 1973.

Fred S. Gilbert, Jr., Washington, D. C., attorney of record, for plaintiffs. Charles P. Duffy, Portland, Or., of counsel.

Robert N. Dorosin, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court without oral argument on plaintiffs' motion, filed April 6, 1973, moving that, pursuant to Rule 141(b), the court adopt the recommended decision filed February 28, 1973, by Trial Commissioner Mastin G. White under Rule 134(h), defendant having failed to file a notice of intention to except and the time for so filing under the rules of the court having expired. Upon consideration thereof, since the court agrees with the decision, as hereinafter set forth, it hereby (granting plaintiffs' motion to such extent) affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiffs are entitled to recover, together with interest as provided by law, and judgment is entered for plaintiffs accordingly, with the amount of recovery to be determined pursuant to Rule 131(c).

## OPINION OF COMMISSIONER

WHITE, Commissioner:

The ultimate question to be decided in this case is whether the payments which the plaintiff Thomas N. Melin ("Mr. Melin") received in 1964 and 1965 under agreements between Mr. Melin and two companies, Owens-Parks Lumber Company ("Owens-Parks") and Rainier Manufacturing Company ("Rainier"), were taxable as long-term capital gains (the position taken by the plaintiffs) or as ordinary income (the position taken by the defendant).

It is my opinion that the payments in question were taxable as long-term capital gains, and, accordingly, that the plaintiffs are entitled to recover in the present action.

The agreement between Mr. Melin and Owens-Parks was dated March 20, 1964, and was denominated a "sales agreement." It provided in part that "MELIN hereby sells, assigns and conveys to OWENS–PARKS * * * all of his right, title and interest in and to * * * Patent No. 2,658,630 and in and to the Lumber Stacking Device described and claimed therein * * * "; and that, "as consideration for the purchase of the patent," Owens-Parks was to pay Mr. Melin a lump sum of $30,000 and a royalty of 10 cents per thousand board feet of Douglas Fir lumber shipped by Owens-Parks during the period from January 1, 1964, to November 10, 1970, the expiration date of the patent on the lumber-stacking device.

The agreement between Mr. Melin and Rainier was dated December 8, 1964, and was in the form of a license. It provided in part that "Licensor [Mr. Melin] hereby grants to Licensee [Rainier] the exclusive right and license to develop, manufacture, use, market, sell and otherwise commercialize, throughout the United States, its territories and possessions," an invention that is commonly referred to as a mechanical offbear and slab-handling apparatus. Rainier agreed to pay Mr. Melin a lump sum of $85,000 and royalties at the rate of 25 cents per thousand board feet on all lumber produced at Rainier's plant.

Prior to entering into the agreement with Rainier, Mr. Melin in December 1962 had applied for a patent on the mechanical off-bear and slab-handling apparatus. A patent was issued to him on September 14, 1965, some 9 months after Mr. Melin and Rainier entered into the agreement dated December 8, 1964.

In 1964, Mr. Melin received $41,312 from Owens-Parks and $113,093 from Rainier under the respective agreements previously mentioned; and he received

$10,112 from Owens-Parks and $32,821 from Rainier in 1965 under such agreements. Mr. Melin and his wife, Virginia W. Melin, reported these amounts as long-term capital gains in their joint federal income tax returns for 1964 and 1965. However, the Internal Revenue Service assessed income tax deficiencies against Mr. Melin and his wife for 1964 and 1965 in the respective amounts of $63,019 and $13,315, the IRS having determined administratively that the payments from Owens-Parks and Rainier under the respective agreements of March 20 and December 8, 1964, were taxable as ordinary income, rather than as long-term capital gains. The amounts of the deficiencies, together with interest, were paid by Mr. Melin and his wife in September 1968, thus providing the bases for the present action.

There does not appear to be any disagreement between the parties over the following points:

(1) Mr. Melin was the inventor of the lumber-stacking device and of the mechanical off-bear and slab-handling apparatus referred to in the respective agreements of March 20 and December 8, 1964.

(2) The respective inventions were made by Mr. Melin (*i. e.*, they were conceived and reduced to practice), and the patents were obtained or applied for by Mr. Melin, more than 6 months prior to the execution of the 1964 agreements.

(3) Prior to the execution of the agreements with Owens-Parks and Rainier, Mr. Melin had not expressly granted, or attempted to grant, to anyone any rights in the patent referred to in the agreement of March 20, 1964, with Owens-Parks, or in the invention referred to in the agreement of December 8, 1964, with Rainier.

(4) The patent referred to in the agreement of March 20, 1964, and the invention referred to in the agreement of December 8, 1964, constituted capital assets.

(5) The agreements of March 20 and December 8, 1964, constituted sales or assignments to Owens-Parks and Rainier, respectively, of all the rights (if any) that Mr. Melin had in the patent and invention mentioned in the respective agreements. Although the agreement of December 8, 1964, between Mr. Melin and Rainier was in the form of a license, it granted to Rainier the exclusive right to make, use, and sell the mechanical off-bear and slab-handling apparatus, and, therefore, it was, in substance, a sale or assignment of the entirety of Mr. Melin's rights (if any) in this invention, rather than a mere license. Waterman v. Mackenzie, 138 U. S. 252, 256, 11 S.Ct. 334, 34 L.Ed. 923 (1891); Kronner v. United States, 110 F.Supp. 730, 734, 126 Ct.Cl. 156, 163 (1953); Bell Intercontinental Corp. v. United States, 381 F.2d 1004, 1011, 180 Ct.Cl. 1071, 1077 (1967).

There is, however, a sharp controversy between the parties over the question of who owned the patent and the invention as of the times when the respective agreements were entered into by Mr. Melin with Owens-Parks and Rainier, and whether Mr. Melin had any rights in the lumber-stacking patent or in the mechanical off-bear and slab-handling invention that could be the subject of a sale or assignment.

The defendant contends that Owens-Parks was the true owner of the lumber-stacking patent prior to and at the time of the execution of the agreement dated March 20, 1964, and that Rainier should be regarded as the owner of the mechanical off-bear and slab-handling invention prior to and at the time of the execution of the agreement dated December 8, 1964. Accordingly, the defendant argues that the agreements of March 20 and December 8, 1964, actually were not sales or assignments of the patent and the invention by Mr. Melin to Owens-Parks and Rainier, respectively, but were merely devices for channeling extra compensation from the two companies to Mr. Melin.

On the other hand, it is the plaintiffs' position that Mr. Melin was the owner of all the rights in the patent and in the invention until he sold or assigned such rights to Owens-Parks and Rainier under the respective agreements of March 20 and December 8, 1964.

### The Lumber-Stacking Device

Mr. Melin was employed by Owens-Parks as a mechanic and equipment operator during the period in 1946 and 1947 when he invented the lumber-stacking device. Owens-Parks operates a large retail lumber business in Los Angeles, California. While Mr. Melin was working for Owens-Parks as a mechanic and equipment operator, he concluded that inefficiency in the use of manpower was prevalent in the retail lumber industry, including the Owens-Parks plant. In particular, he observed that about 30 individual tally and order men were used by Owens-Parks in assembling lumber to fill retail orders, which included placing lumber on a conveyor chain and repiling it into square packages for delivery to retail customers. It was apparent to Mr. Melin that Owens-Parks had poor labor and production efficiency in the assembly and packaging of lumber for retail customers.

On his own time, and outside of his regular working hours for Owens-Parks, Mr. Melin mentally reviewed, considered, and rejected various possible systems for the improvement of efficiency in the use of manpower by Owens-Parks. Finally, he conceived the idea of a lumber-stacking device that could be used for the assembly and packaging of lumber for retail customers in such a way that the arrangement of the various pieces in a particular package would be of maximum convenience to the prospective user and, at the same time, would substantially reduce the amount of manpower needed for this operation. Mr. Melin next made sketches, on his own time, of the proposed device and refined its design.

After conceiving and designing the lumber-stacking device, Mr. Melin, with the consent of Owens-Parks, used the shop and welding facilities of Owens-Parks, and the assistance of two other mechanics employed by Owens-Parks, to build the first lumber-stacking device. It was built on company time, and from spare parts and discarded machinery that were owned by Owens-Parks and had a value of approximately $5,000.

Mr. Melin obtained the services of a patent attorney to prepare, file, and prosecute an application for a patent on the lumber-stacking device. Mr. Melin paid the fee and expenses of the attorney, and the other expenses that were involved in obtaining a patent.

In about February 1948, with the consent of Mr. Melin, Owens-Parks first began to use the lumber-stacking device in its business. It has continued to use such device since that time. Owens-Parks did not make any payment to Mr. Melin for the use of the lumber-stacking device until 1964.

The traditional rule is that where a person is employed by another to make an invention and he succeeds in accomplishing the assigned task during the period of employment, the employer is the equitable owner of the invention, and the employee is obligated to assign to the employer any patent that may be obtained on the invention, since the employee has only produced that which he was employed to invent; but that no assignment of the patent to the employer is required in a situation where an employee who is not assigned the specific task of inventing makes an invention, even though the invention relates to the employee's field of employment and the employer's time and resources are utilized in making the invention. Hapgood v. Hewitt, 119 U.S. 226, 7 S.Ct. 193, 30 L.Ed. 369 (1886); Solomons v. United States, 137 U.S. 342, 346, 11 S.Ct. 88, 34 L.Ed. 667 (1890); United States v. Dubilier Condenser Corp., 289 U.S. 178, 187–188, 53 S.Ct. 554, 77 L.Ed. 1114 (1933).

Since Mr. Melin was not employed by Owens-Parks to invent the lumber-stack-

ing device—or to invent anything else— Mr. Melin was not obligated under the rule quoted in the preceding paragraph to assign the patent on the lumber-stacking device to Owens-Parks.

The defendant urges, however, that Mr. Melin was obligated to assign the patent on the lumber-stacking device to Owens-Parks under the "alter ego" theory enunciated in Dowse v. Federal Rubber Co., 254 F. 308 (N.D.Ill.1918). In that case, Dowse was the president and general manager, a one-fifth owner, the dominant member of the 3-member board of directors, and in complete control of the operations of a company engaged in the manufacture of rubber tires. While occupying such a relationship with the company, Dowse invented and obtained a patent on a method for reinforcing automobile tires, known as the "double cable base." At the time of the suit, Dowse had left the manufacturing company. The question before the court related to the ownership of the patent, as between Dowse and the company. The court said (at page 310) that "the real test is whether Dowse occupied such a relation to the corporation that he was its alter ego, in such a capacity that it is only consistent with good faith that he should recognize its ownership of the patent issued to him." On the basis of the facts, the court held that Dowse was the company's "alter ego," and that the company was the equitable owner of the patent.

This court applied the "alter ego" theory in LeFiell v. United States, 162 Ct.Cl. 865, 871 (1963), which involved the question of the ownership of a patent in a situation where the inventor was the president, general manager, and principal stockholder of a company at the time when the invention was made, and the company's time, shop facilities, employees, and finances were used in developing the invention and obtaining a patent on it in the inventor's name.

The company was held to be the owner of the patent.

Mr. Melin's situation in relation to Owens-Parks during the 1946–47 period when he invented the lumber-stacking device was not at all comparable to the situations that were involved in the *Dowse* and *LeFiell* cases. Mr. Melin was not an officer or director of Owens-Parks, and he did not exercise control over the operations of that company, at the time mentioned. He was only a mechanic and equipment operator in the employ of the company, taking orders as to the performance of the job from higher authority in the company. He was not a stockholder in 1946, although in 1947 he acquired 100 shares of Owens-Parks stock out of a total of 4,800 shares that were issued and outstanding at the time. Mr. Melin could not, under any reasonable understanding of the term, be regarded as the "alter ego" of Owens-Parks at the time when he invented the lumber-stacking device.

It is true that by 1964, when the agreement between Mr. Melin and Owens-Parks was entered into, Mr. Melin had become vice president of Owens-Parks in charge of engineering and production, he was one of the seven members of the corporation's board of directors, and a controlling majority of the Owens-Parks stock was held by members of the Melin family.[1] However, Mr. Melin certainly was not the "alter ego" of Owens-Parks in 1964. The chief executive officer and largest stockholder of Owens-Parks at the time was Charles R. Melin, Mr. Melin's father, an autocratic and very volatile individual. The evidence indicates clearly that Mr. Melin did not exercise any dominant control over his father in connection with the operations of Owens-Parks. On the contrary, Charles R. Melin discharged Mr. Melin as an officer and employee of Owens-Parks after 1964.

---

1. Mr. Melin, his wife, and his children owned a total of 206 shares of stock in Owens-Parks out of a total of 4,515 shares that were issued and outstanding in 1964.

Other close relatives (Mr. Melin's father, his mother, his grandmother, and his brother) owned a total of 2,769 shares.

Furthermore, in determining the question of the ownership of a patent as between an employer and an employee under the "alter ego" theory, the *Dowse* case shows that the relationship which existed between the employer and the employee at the time when the invention was made is determinative, and not the relationship at a subsequent time. Therefore, the relationship that existed between Mr. Melin and Owens-Parks in 1964 is really immaterial.

■ Since Mr. Melin was not employed by Owens-Parks to invent the lumber-stacking device, and since there is no valid basis for regarding Mr. Melin as the "alter ego" of Owens-Parks at the time when he made this invention, Mr. Melin—and not Owens-Parks—was the true owner of the patent on the lumber-stacking device at the time when the parties entered into the agreement of March 20, 1964.

■ On the other hand, it appears that Owens-Parks had a shop right in the lumber-stacking device and patent, *i. e.*, the right to have a royalty-free, non-exclusive, and non-assignable license to use this invention in the company's business at all times during the life of the patent. As indicated earlier in this part of the opinion, Mr. Melin used the shop and welding facilities of Owens-Parks, and the assistance of two other mechanics employed by Owens-Parks, to build the first lumber-stacking device. It was built on company time, and from spare parts and discarded machinery that were owned by Owens-Parks and had a value of approximately $5,000. Therefore, the company's investment in the device was substantial. Mr. Melin then permitted Owens-Parks to use the lumber-stacking device in its business, free of charge, from about February 1948 until 1964.

■ In a situation where it appears that an employer made a substantial investment in an invention conceived by an employee, and that the inventor consented to the employer's use of the invention, the employer has a shop right in the invention. LeFiell v. United States, *supra*, 162 Ct.Cl. at page 869. This is so even though the invention was conceived on the employee's own time. Gill v. United States, 160 U.S. 426, 433–434, 16 S.Ct. 322, 40 L.Ed. 480 (1896).

■ Therefore, the sales agreement of March 20, 1964, between Mr. Melin and Owens-Parks conveyed to the latter all rights in the lumber-stacking device and patent, except the right which Owens-Parks already had to use this invention and patent in the company's business on a non-exclusive basis and without the payment of royalty to Mr. Melin. The principal right acquired under the agreement was the right to control the use of the invention and patent by others, either by issuing licenses to others or by withholding the issuance of licenses from others. The circumstance, as shown by the evidence, that Owens-Parks did not make any effort to issue licenses under the patent during the period between March 20, 1964 (the date of the execution of the agreement between Mr. Melin and Owens-Parks) and November 10, 1970 (the expiration date of the patent on the lumber-stacking device) cannot be regarded as proof that the rights which Mr. Melin conveyed to Owens-Parks in the sales agreement of March 20, 1964, were without value. On the contrary, the inference is warranted that such rights did have value.

For the reasons previously indicated in this part of the opinion, it is concluded that the amounts which Mr. Melin received from Owen-Parks in 1964 and 1965 under the agreement of March 20, 1964, should properly be regarded as long-term capital gains.

### The Mechanical Off-Bear and Slab-Handling Apparatus

Rainier is a large-volume manufacturer of framing lumber. Its principal office and plant are located in Rainier, Oregon, which is 50 miles west of Portland and on the Columbia River.

In 1956, when Mr. Melin was vice president and general manager of Rainier, a large fire completely destroyed

Rainier's plant. Mr. Melin was assigned the task of supervising the construction of a new plant, and part of his task was to incorporate in the new plant as much labor-saving equipment as possible.

During the substantial period of time while Mr. Melin was organizing the work for the construction of the new plant, hiring personnel, and drafting layouts for the plant, he utilized his free time, outside of his regular working hours for Rainier, in attempting to think of innovations that would increase the production of lumber and decrease the need for manpower in the new plant. One result of Mr. Melin's thinking along these lines was the conception, on his own time, of the idea for a device that is commonly referred to as the mechanical off-bear and slab-handling apparatus.[2]

After conceiving the idea of the mechanical off-bear and slab-handling apparatus, Mr. Melin built the apparatus on the site of the Rainier plant and on company time; and he utilized for this purpose shop equipment owned by Rainier and mechanics employed by Rainier.

With Mr. Melin's consent, Rainier first began to use the mechanical off-bear and slab-handling apparatus on an experimental basis in 1958, at about the time when the new plant commenced operations. However, the apparatus was not very effective in the beginning, and Mr. Melin continued to make improvements in it for several years. The apparatus was perfected for semi-automatic operation in 1963.

Mr. Melin engaged the services of a law firm to prepare, file, and prosecute an application for a patent on the mechanical off-bear and slab-handling apparatus. The application for patent was filed on December 26, 1962, and the patent was issued to Mr. Melin on September 14, 1965, some 9 months after Mr. Melin and Rainier entered into the agreement of December 8, 1964. Mr. Melin paid the fee and expenses of the law firm, and also the other costs that were incurred in securing the patent.

■ Although Mr. Melin was directed by Rainier to incorporate in the new plant as much labor-saving equipment as possible, he was not employed by Rainier to *invent* the mechanical off-bear and slab-handling apparatus, or any other equipment. Consequently, Mr. Melin was not under any obligation to assign this invention to Rainier under the traditional rule discussed in the preceding part of this opinion. The crucial question as to ownership, then, is whether Mr. Melin should be regarded as the "alter ego" of Rainier at the time when the mechanical off-bear and slab-handling apparatus was invented.

■ During the period when the mechanical off-bear and slab-handling apparatus was conceived and reduced to practice, Mr. Melin was vice president and general manager of Rainier, he was directly responsible for all operations of the company, he was a member of the company's board of directors, and he was a principal shareholder of the company.[3]

Mr. Melin's relationship to Rainier at the time of the invention of the mechanical off-bear and slab-handling apparatus can be distinguished from the situations which the courts dealt with in the *Dowse* and *LeFiell* cases, discussed in the preceding part of this opinion. The inventor-employee in each of those cases was the president and general manager

---

2. See paragraphs (b) and (d) of finding 20 [omitted from published opinion] for a description of this device.

3. In 1956–57, Mr. Melin was the second-largest shareholder, with 5,824 shares out of a total of 25,000 outstanding shares. In 1958, he became the largest shareholder, with 6,824 shares out of a total of 30,000 shares. He has been the largest shareholder, with 6,824 shares, since 1958, but the total number of shares has been reduced to 22,440 since June 1966.

of the employer-company. Here, although Mr. Melin, as vice president and general manager, was directly responsible for Rainier's operations, his father, Charles R. Melin, was the president and chief executive officer of the company. As indicated in the preceding part of this opinion, Charles R. Melin was an autocratic, volatile individual who did not hesitate to exercise his authority in dealing with members of his family concerning company affairs. It has been mentioned previously that Charles R. Melin discharged Mr. Melin as an officer and employee of Owens-Parks; and it would be appropriate to state here that Charles R. Melin also discharged another son, Arthur K. Melin, from the employ of Owens-Parks. So long as Charles R. Melin was serving as the president and chief executive officer of Rainier, it would not be realistic to regard Mr. Melin as the "alter ego" of that company.

It must be concluded, therefore, that Mr. Melin—and not Rainier—was the owner of the mechanical off-bear and slab-handling invention.

However, since Rainier made a substantial investment in this invention, and since Mr. Melin consented to the use of the invention by Rainier, without charge, from 1958 to 1964, Rainier had the right in 1964 and thereafter to use the invention in its business on a nonexclusive basis and without the payment of royalty to Mr. Melin (*i. e.*, Rainier had a shop right in the invention).

What has been said in the preceding part of this opinion with respect to the rights conveyed by Mr. Melin to Owens-Parks in the agreement of March 20, 1964, and the value of such rights, is equally applicable to the effect of the agreement dated December 8, 1964, between Mr. Melin and Rainier.

It necessarily follows that the amounts which Mr. Melin received from Rainier in 1964 and 1965 under the agreement of December 8, 1964, constituted long-term capital gains.

Robert H. McKELVY and Maxine McKelvy

v.

The UNITED STATES.

R. Hugh McKELVY and Tula E. McKelvy

v.

The UNITED STATES.

Nos. 357–71, 358–71.

United States Court of Claims.

May 11, 1973.

