**AMOCO PRODUCTION COMPANY,**
Appellee,

v.

**Ralph Herbert LINDLEY, Appellant.**

**No. 51543.**

Supreme Court of Oklahoma.

Jan. 15, 1980.

---

1. See 12 O.S.Supp.1976, Ch. 15, App. 3, Rule 3.13.

Floyd L. Walker, Walker, Jackman & Associates, Inc., Tulsa, for appellee.

Ralph Herbert Lindley, pro se.

Douglas L. Boyd, Tulsa, for appellant.

BARNES, Justice:

This case centers on the contested ownership of a computer "software" program commonly referred to as the "Lindley System". The "Lindley System" was developed by the Defendant-Appellant while he was in the employ of the Plaintiff-Appellee.

The events leading up to the present litigation began in 1964 upon Lindley's employment with Amoco under a written contract whereby he agreed "to disclose promptly and in writing . . . all inventions or discoveries capable of use in connection with the business of COMPANY . . . and agrees not to disclose same to others, except as required by his employment, without consent of COMPANY." Lindley was employed to do research relating to geological exploration for oil and gas, and he did create various devices, some of which were patented, in keeping with the contract provisions.

Mr. Lindley is a well log analyst by formal training, and therefore his basic research projects were in the area of developing means of using well log data more efficiently and more quickly in the search for hydrocarbons. Well log analysis is a basic tool for engineers and geologists to determine if oil is present in certain geological formations. It is a time-consuming process in a business where it is important to move quickly to ascertain oil prospects in order to obtain leases to the land prior in time to a competitor. The information originally obtained in a well log can be digitized, and once in this format it can be analyzed by a computer. Properly programmed, the computer will analyze well logs in a relatively short period of time. Computer analysis of well logs is a recent innovation and is little developed, so that a company with a good computer "software" system has a competitive advantage within the field of hydrocarbon exploration.

In early 1971, Lindley orally requested permission from Dr. Walton, head of Amoco's Geological Research Department, to develop a general purpose, comprehensive log analysis system with which the data from the operational log digitizer (an invention by Lindley, patented by Amoco) would be analyzed and computed. Lindley's request was denied orally and later in writing by Amoco on the ground that the Company had made a decision to develop another computer program for this purpose [Applications Management System—"A.M.S."] and did not wish to allow development of

competing systems within the Company. Lindley then worked on the existing log analysis program during Company time, but on his own time he continued to work on his concept of a computer log analysis. In 1973, Lindley disclosed his work to the A.M.S. team and other members of Amoco's management. Thereafter, Lindley was directed to cease creative work on the system and take the developed concepts and integrate them into Amoco's present system. Lindley did document the existing capabilities of the Lindley System during working hours, for use in the A.M.S. System, but continued working on additional program capabilities on his own time. Amoco officially recognized the Lindley System in 1975, when it was found to be responsible for the location of large hydrocarbon-bearing subsurface geological formations. Ten months later, Mr. Lindley left the Company, due to differences with management over the program.

The procedural history of the case is important to understanding the present appeal. Amoco brought suit in the District Court of Tulsa County against Lindley, asking for specific performance of an employment contract. Amoco asserted that under the terms of the contract any "invention" or "discovery" made by Lindley during his employment, which could be used in its business, was its property and not that of the employee. Amoco also requested injunctive relief to restrain Lindley from divulging Amoco's "trade secret" embodied in the "Lindley System" to third parties.

An ex parte temporary restraining order was issued and, upon hearing, a temporary injunction was issued which precluded the Defendant-Appellant from using any part or portion of the Lindley System, including the concepts thereof, for his own use or benefit, or for the use or benefit of any third party, nor could Lindley divulge the workings of this alleged "trade secret" to third parties.

After the temporary injunction was entered, Amoco moved to have the court impose sanctions against Lindley for his fail-

ure to produce documents pursuant to court order under the pretrial discovery statute, 12 O.S. 1971, § 548. The court, relying on the findings in the preliminary injunction hearing, plus testimony concerning Mr. Lindley's failure to produce, ordered the Defendant's answer and counterclaim stricken, ordered Lindley to specifically perform certain services under the employment contract while the District Court retained jurisdiction to enforce the specific performance, and Lindley was permanently enjoined from using or disclosing the "Lindley System" or the concepts thereof. Mr. Lindley had, prior to the imposition of sanctions, filed an appeal in this Court, pursuant to 12 O.S.1971, § 993, from the Interlocutory Order for temporary injunction. After the sanctions were issued, he submitted an application to this Court to assume original jurisdiction and for a Writ of Prohibition against the Trial Judge imposing the sanctions, which this Court treated as an application for a stay order, and the respective actions were consolidated into this present appeal.

### I.

Although the appeals are consolidated, we will address the issues presented separately. The threshold question is whether the granting of a default judgment was an abuse of discretion under the totality of the circumstances, in this case failure to produce. This is the thrust of the appeal in Case No. 51,543.

Mr. Lindley was ordered to produce certain documents through a motion by Plaintiff pursuant to 12 O.S. 1971, § 548.[1] The court ordered the production of documents under the statute. In *Carman v. Fishel, 418 P.2d 963, 972 (Okl.1966)*, this Court found that the statute requires a showing of good cause, and further requires more than conclusions to justify the required showing of good cause, and the burden of showing good cause is on the movant. There is no recitation of good cause in the motion or in the order of the court compelling the discovery. In *Lisle v. Owens, 521 P.2d 1375, 1377 (Okl. 1974)*, there were substantially more statements as to why documents were needed, but the movant failed to state facts sufficient to show that the information could not be obtained elsewhere. Instead, he merely recited allegations of suspected hostility or inability to obtain. The Court stated the test for a showing of "good cause" to "require a showing of factual good cause as opposed to conclusionary or speculative good cause." This was absent in the present motion for production.

In *Carman, supra, at page 968*, we said that discovery statutes do vest a trial court with wide discretion in interpretation of these statutes. Although this Court is reluctant to interfere in the action of a trial court, we have that power and will do so "when it may be shown that the trial court clearly exceeded its authority."

Oklahoma requires the showing of good cause before the trial court can exercise its discretion in allowing the order to be entered. When a showing of good cause is absent, the enforcement of the pretrial dis-

---

1. "§ 548. Discovery and production of documents, etc.—Copying

"Upon motion of any party *showing good cause* and upon notice to all other parties, and subject to the equitable power of the court to protect any party or witness from annoyance, embarrassment, or oppression, the court in which an action is pending may (1) order any such party to produce and permit the inspection and copying or photographing, by or on behalf of the moving party, of any designated documents, papers, books, accounts, letters, photographs, motion picture film or negatives thereof, developed or undeveloped photographic film, objects, or tangible things, not privileged, which consti-

tute or contain evidence relating to any of the matters within the scope of examination permitted by deposition and which are in such parties' possession, custody or control, or (2) order any party to permit entry upon designated land or other property in his possession or control for the purpose of inspecting, measuring, surveying, or photographing the property or any designated object or operation thereon within the scope of which examination is now permitted by deposition. This order shall specify the time, place, and manner of making the inspection and taking the copies and photographs and may prescribe such terms and conditions as are just." [Emphasis added.]

covery order can be prohibited by this Court. *Carman, supra, 418 P.2d at page 973.*

 It seems logical that if the Court can prohibit the enforcement of the discovery order, it can certainly lift the sanctions imposed by the trial court which erred in issuing the order.

The problem now becomes, if indeed Lindley has destroyed the documents requested by the Plaintiff, as alleged, can the court accept another motion to compel discovery and sanction the Defendant for failure to do so by a default judgment? We hold that the court cannot.

Section 548 provides no sanctions for failure to produce, while Section 549, dealing with interrogatories, does allow sanctions, and one of those is for default judgment. Therefore, Appellee asserts that the court can impose a default judgment by analogy to the interrogatory statute, or in the alternative it is within the inherent power of the court "to do all things that are necessary for the administration of justice within the scope of its jurisdiction." *Layman v. State, 355 P.2d 444 (Okl.Cr.App.1960).*

Again, it is not a question of the power of the Court to impose the sanction because the power is there. The question is, rather, whether the extreme sanction of default judgment would be appropriate under the facts of this case.

Appellee relies on two cases for the proposition that a default judgment is an appropriate sanction for failure to produce documents so ordered by the court. In the first case, *National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976),* the Court reversed the Court of Appeals which had held that the District Court had abused its discretion in dismissing the plaintiff's antitrust action against defendant for failure to timely answer written interrogatories. In this case, interrogatories were not answered for seventeen months, numerous extensions were granted at the last minute, and, when finally submitted, were evasive and unresponsive. The Court found the plaintiff to be acting in bad faith. The Court stated:

"But here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to district court in appropriate cases." 427 U.S. at page 643, 96 S.Ct. at page 2781.

The Court went on to say it was justified under the circumstances here because of "flagrant bad faith and their counsel's 'callous disregard' of their responsibilities." *Id.*

The other case cited by Appellee is *Trans World Airlines, Inc. v. Hughes, 32 F.R.D. 604 (S.D.N.Y.1963).* In *Hughes,* a default judgment was entered against the defendant on a finding that he deliberately and willfully refused to have his deposition taken. Said deposition was shown to be essential to presentation of plaintiff's case.

Default judgments have been granted when the action by the person who fails to comply with pretrial discovery procedures has been willful and extreme. This Court did uphold the imposition of a default judgment for failure to fully answer interrogatories in *Nu-Pro, Inc. v. G. L. Bartlett & Co., Inc., 575 P.2d 618 (Okl.1977),* but we did find that the trial court was acting pursuant to statute (12 O.S.1971, § 549(c)). There is no such statutory allowance in Section 548, and we do not believe it is appropriate under the circumstances presented here. In *Nu-Pro,* the Court states no abuse of discretion, but does not delineate what types of fact situations will entitle the person moving for the sanctions to a default judgment. The two Federal cases cited supra indicate the non-compliance must be grossly in bad faith. This rule has been accepted by this Court in *Moor v. Babbitt Products, Inc., 575 P.2d 969 (Okl.1978),* where we relied on *Societe Internationale v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958),* for the proposition that a default judgment entered for failure to produce under the discovery statutes is an abuse of discretion when failure to comply is not due to fault of plaintiff because out of his power.

Mr. Lindley did produce what documents he had in his possession; in fact, the Plaintiff entered on his premises and took all documents which even remotely related or appeared to relate to computer programming, without discerning at the taking whether they were in actuality related to its discovery order for the workings of the Lindley System. The discovery order could never be made so broad as to encompass all the mental concepts of a man. None of the circumstances which warranted default judgment in the Federal cases is present here, such as repeated attempts to discover extended over long periods of time, or absolute unwillingness to produce anything. Mr. Lindley had destroyed some documentation prior to the motion to produce. The Plaintiff had also failed to produce. There is some question as to Mr. Lindley's good faith in not producing, but there is also some question as to Plaintiff's good faith. The totality of the circumstances do not warrant the extreme sanction of default judgment, and the entering of default judgment under the circumstances here was an abuse of discretion. In addition, the order itself to produce was absolutely ineffective for failure to show "good cause", and thus the sanctions are a nullity.

2. Contract in pertinent part:

"COMPANY hereby engages EMPLOYEE to devote his time, skill, labor and knowledge to the advancement of the COMPANY'S interest by performing such duties as may be assigned to him and in general by aiding to whatever extent he may, consistent with the performance of his specifically assigned duties, in the prosecution of research and technical development and in the making and perfecting of inventions and discoveries capable of use in connection with the business of COMPANY, and its Affiliates, which work EMPLOYEE recognizes as being a material function of COMPANY'S business. * * *

* * * * * *

"EMPLOYEE hereby agrees to disclose promptly and in writing . . . all inventions or discoveries capable of use in connection with the business of COMPANY . . which EMPLOYEE, alone or with others, has made or may make during his employment by COMPANY, and he hereby assigns and agrees to assign all his right, title and interest in and to such inventions or discoveries to COMPANY . . . and agrees not to disclose same to others, except as required by his employment, without consent of COMPA-

## II.

The second appeal, which is numbered 51,011, deals with the interlocutory appeal from the entering of the temporary injunction. The Trial Judge made certain findings of fact and law which we will address, and, upon remand of this case for further determination, our findings on the record before us will be conclusive as to those issues found to be decided erroneously.

The Trial Judge, in issuing the temporary injunction, found as a matter of law that the Lindley System was an invention, and that the employment contract governed the rights of the parties to the invention. Since the computer system developed by Lindley was useful in the business of Amoco, the "invention" was solely owned by Amoco.

The Appellant, who for the greater part of this litigation has artfully and adeptly represented himself, argues on appeal that the Lindley System is not an invention and is therefore not the property of Amoco under the contract.

The contract provisions[2] do purport to give ownership to the Company of all inventions and discoveries made by an em-

NY. EMPLOYEE further agrees that during his employment . . . or at any time thereafter he will on request of COMPANY execute specific assignments to COMPANY . . . of any such inventions or discoveries, made during his employment by COMPANY, applicable to the United States and to any and all foreign countries, as well as execute all papers and perform all other lawful acts which COMPANY deems necessary or advisable for the preparation, filing, prosecution and maintenance of patent applications and patents of the United States and foreign countries and for the transfer of interests therein, including the execution of original, divisional, continuing and reissue applications, preliminary statements, affidavits and concessions, and the giving of testimony with respect to said inventions, discoveries, applications and patents. * * *

"COMPANY agrees to consider or have considered with reasonable promptness every invention or discovery submitted in writing by EMPLOYEE and at its option to request specific assignment thereof and of all patent rights thereon applicable to both the United States and foreign countries. COMPANY agrees that if and when it decides to

ployee while working for Amoco, but the contract is liberally interspersed with language applying to patents, which indicates to us that the "invention" must be an invention which would be considered such under applicable patent law, whether the invention is patented or not.

■ The Trial Judge was correct in stating that "the right of the employer, if there is any to the invention of his employee, springs from the contract of employment . . . because were it otherwise but for an express agreement or implied agreement in the employment relationship, then the employee's invention remains the property of the employee." Thus, the crucial issue is whether this computer software system is an invention. The Trial Judge found that the "software" program was not a discovery. We agree. This is so because discovery is something less than invention, because it does not entail the creative genius which gives birth to an inventive concept; it can result from mere application, industry, or be simply fortuitous. Discovery is finding something unknown, but it is entitled to no more protection than an invention and must meet the same strenuous prerequisites of patentability as an invention. Thus, the law as to invention is equally applicable to discovery.

The trial court, in reaching its decision, relied on the definition of invention from Black's Law Dictionary, which states:

"INVENTION. *In patent law*, the act or operation of finding out something new; the process of contriving and producing something not previously known or existing, by the exercise of independent investigation and experiment. Also the article or contrivance or composition so invented." [Citations omitted.] Black's Law Dictionary, p. 740 (5th Ed. 1979). [Emphasis added.]

The court also relied on a definition of invention found in *General Electric Co. v. Sangamo Electric Co., 174 F. 246, 251 (7th Cir. 1909)*, which states:

"Invention, in the nature of improvements, is the double mental act of discerning, in existing machines or processes or articles, some deficiency, and pointing out the means of overcoming it."

Both definitions are based on patent law; thus it follows that "invention", to be so classified for purposes of determining ownership under the contract, must be patentable whether it is or not. Under the Patent Act of 1952, 35 U.S.C., §§ 100–292 (1976), there are three standards for patentability: (1) containment within the statutory subject matter; (2) novelty; and (3) non-obviousness.[3] Section 112 of the Act defines the scope of patentability. The requirements are cumulative, and to date no computer program, as such, has ever been granted a patent. The statute contemplates two types of statutory patents called "apparatus" and "process" patents. The apparatus claims had some success in the patent courts on the theory that if a machine is programmed in a new and unobvious way, it is a machine physically different from a machine without the program. See *Application of Bernhart, 417 F.2d 1395, 57 CCPA 737 (1969); Application of Prater, 415 F.2d 1393, 56 CCPA 1381 (1969).* How-

take a specific assignment of any invention or discovery from EMPLOYEE, with or without the filing of a patent application, COMPANY . . . will pay EMPLOYEE Fifty Dollars ($50.00) upon his executing said assignment. * * *"

3. The statute in pertinent part states:
 "§ 101. Inventions patentable.
 "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

"102. Conditions for patentability; novelty and loss of right to patent."
 This section states that novelty is the important aspect, and therefore the new invention must not be in the prior art.
 "§ 103. Conditions for patentability; non-obvious subject matter.
 "The differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which such subject matter pertains."

ever, later cases have generally found the concept of a novel use of computer hardware, i. e., the "apparatus" claim, to be unavailing. See *Gottschalk v. Benson, 409 U.S. 63, 71, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972)*.

Process claims failed, as well; first, by what is called the "mental processes" doctrine, which means if a patent application described a process that could be performed entirely by a mental process or by the additional use of pencil and paper, the patent was rejected because a monopoly could not be granted on a cognitive process. This theory was dropped in *Application of Musgrave, 431 F.2d 882, 57 CCPA 1352 (1970)*, where the court found that to bring a program within the statutory framework, it must be in the field of technology, but this has not aided the patentability of the programs.

Recent United States Supreme Court decisions have denied patents to computer programs. See *Gottschalk, supra*, where the application was denied because the effect would be to give the patent programmer a monopoly on a mathematical formula; and *Dann v. Johnston, 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976)*, where the application was denied because it involved no novel concept besides a formula.

In *Parker v. Flook, 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978)*, the Court denied an application of a method to update alarm limits. The Court said at *437 U.S. 584, 594, 98 S.Ct. 2522, 2528, 57 L.Ed.2d 451*:

> "Here it is absolutely clear that respondent's application contains no claim of patentable invention. The chemical processes involved in catalytic conversion of hydrocarbons are well known; as are the practice of monitoring the chemical process variable, the use of alarm limits to trigger alarms, the notion that alarm limit values must be recomputed and readjusted, and the use of computers for automatic process monitoring-alarming. Respondent's application *simply provides a new and presumably better method for calculating alarm limit values*." [Emphasis added.]

■ The Lindley System, by way of comparison, is not new or novel; it is a combination of two arts—well log analysis and computer programming. The system can do nothing that cannot be done manually; its utility and importance lies in the facts, from evidence presented in the injunction hearing, that it is a better and more efficient way of getting the data sought. The above cited cases show this is simply not enough to make it patentable.

Each of the last Supreme Court patent cases has occasioned submission of amicus curiae briefs in support of patent protection for computer "software", but the Court has consistently stated that its job is to interpret the patent statutory law as it now stands, which admittedly was enacted prior to the advent of computer programs, and if these programs are to be afforded patent protection, it must be provided by legislation. See generally, *M. Pope & P. Pope, Protection of Proprietary Interests in Computer Software, 30 Ala.L.Rev. 527 (1979); Note, Protection of Computer Software—a Hard Problem, 26 Drake L.Rev. 180 (1977)*.

The Appellee argues that the Lindley System is an invention, regardless of whether patentable or not, and expressly covered by the contract and is thus the property of Amoco. If the Appellee is to prevail, the contract must withstand traditional contract interpretation principles.

■ The contract is an Oklahoma contract, and our law governing contract interpretation places primary significance on the intent of the parties at the time of contracting, which in this case was 1964. *Paterson v. Southwestern Bell Telephone Co., 411 F.Supp. 79 (E.D.Okl.1976); Humphreys v. Amerada Hess Corp., 487 F.2d 800 (10th Cir. 1973); Universal Underwriters Ins. Co. v. Bush, 272 F.2d 675 (10th Cir. 1960)*. The intention of both parties must be found in the whole contract and a construction given to the contract which will give effect to each provision. *In re Public Leasing Corp., 488 F.2d 1369 (10th Cir. 1973)*. The contract can be explained through the circumstances at the time of contracting and sub-

sequently taking into consideration the subject matter thereof. *First Nat'l Bank in Dallas v. Rozelle, 493 F.2d 1196 (10th Cir. 1974); Paterson, supra; Continental Federal Savings and Loan Ass'n v. Fetter, 564 P.2d 1013 (Okl.1977). See generally* 15 O.S. 1971, §§ 151–165.

■ The hearing on the temporary injunction produced the following relevant evidence as to the contract. It is a fine-print form contract used frequently by Amoco, and it is not confined to those people who work in the research area, who would be most likely to produce "inventions" and "discoveries". The contract is liberally laced with language concerning patents. Of primary importance as to the intent of the parties is Section V, which states in pertinent part:

"COMPANY agrees that *if and when* it decides to take a specific assignment of any invention or discovery from EMPLOYEE *with or without the filing* of a patent application, COMPANY or its nominee will pay to EMPLOYEE Fifty Dollars ($50.00) upon his executing said assignment." [Emphasis added.]

The language is not ambiguous. It contemplates affirmative action on the part of the employer to assert rights to an employee's work product if the employer is to be considered as owning it.

Mr. Lindley was not approached as to ownership until this suit was brought; the Company left the program in his control completely. He was formally denied in writing the right to develop it, with the Company later retrenching when it was proven to be valuable. The manuals of operation were not marked confidential or even numbered to show how many were out and where distributed by Lindley to any employee upon request. This action by Amoco does not show an exercise of dominion over the Lindley System. There is even testimony that the Company was willing to allow their London facility to pay money directly to Lindley if he would enhance the use of the installed Lindley System there.

In *Jamesbury Corp. v. Worcester Valve Co., 318 F.Supp. 1 (D.Mass.1970)*, there was a contract of employment similar to the one in question here, and that Court found at page 8:

"[I]n ascertaining the parties' intention in using the word 'invention' in the agreement between Rockford and Freeman, the contract as a whole is, of course, important . . . the term [invention] was used in connection with 'patent applications' and there is nothing in the agreement to indicate that the parties used it in any different sense from that which would constitute an invention under patent law."

This is the same situation involved here. A search of the cases which hold that by express contract an employer is the owner of his employee's invention shows that these cases inevitably deal with patent law and patent applications. *Melin v. United States, 478 F.2d 1210, 201 Ct.Cl. 748 (1973); Blum v. C.I.R., 183 F.2d 281 (3rd Cir. 1950); and Hebbard v. American Zinc, Lead and Smelting Co., 66 F.Supp. 113, aff'd 161 F.2d 339 (8th Cir. 1947).* This indicates that the law considers an invention to be one which is patentable under patent law and is used in this context in employment contracts which use the term in connection with "patent applications".

Thus, it is concluded that the trial court's conclusion as a matter of law that the "Lindley II System", as testified to in the temporary injunction hearing, satisfies the terminology and definition of "an invention . . . in the law as well as that term is used in connection with the contract", is clearly erroneous and cannot stand. That, however, does not end our inquiry, because the trial court went on to call the system a "trade secret". The reasoning of the court was that if there was a contract giving property rights to Amoco in the invention of its employee, then that invention was a "secret process", which gave Amoco a business advantage, and the common law would entitle the Plaintiff, even in the absence of a contract, to prevent Defendant's disclosure of the "trade secret".

We have previously held herein that the Lindley System is not an invention and

cannot be owned by Amoco on that basis. There is no question that under applicable law a computer system could be classified as a "trade secret", which is generally defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement of Torts, § 757, Comment b, at page 5 (1939). The problem with the trial court's analysis of the Lindley System is that as a matter of law there was insufficient evidence before the court for a finding of trade secret.

In the Restatement of Torts, Comment b, at page 6, it is stated:

"... a *substantial element of secrecy must exist*, so that, except by the use of improper means, there would be *difficulty* in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him [employer] to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." [4] [Emphasis added.]

The burden of proving these criteria is on the Plaintiff. Like the common law, the contract as it relates to non-disclosure will not aid the Plaintiff here because it deals only with inventions or discoveries made by the Defendant while in the employ of the Plaintiff. The software system is not an invention, so on the sole basis of the contract Mr. Lindley could disclose it, or use it for his own benefit.

The decision of the Trial Judge was based on the contract, and the evidence to support a finding of "trade secret" is simply not in the record. There has to be evidence that indeed the secret was a secret, and that evidence is not before the court. The Lindley System certainly was treated in a much less secretive manner than the Inlan [A.M.S.] System favored by management, as testified to by Amoco's own witnesses. The Inlan user manuals were stamped confidential, numbered, and controlled centrally by management. This was not true of the Lindley System. Trade secret status is difficult to establish and often entails establishing that affirmative and elaborate steps were taken to insure that the secret claimed would remain so. *Telex Corp. v. International Business Machines Corp., 367 F.Supp. 258 (N.D.Okl.1973), rev'd on other grounds, 510 F.2d 894 (10th Cir. 1975); Com-Share, Inc. v. Computer Complex, Inc., 338 F.Supp. 1229 (E.D.Mich.1971).*

The Appellee relies on *Sperry Rand Corp. v. Rothlein, 241 F.Supp. 549 (D.Conn.1964),* to establish that where an employee is hired under an express contract to deliver all inventions to the employer, the employee may not on termination of his employment divulge his employer's trade secret, even when it was created by the employee. The case is distinguishable from this case. There, one of the defendants had approached the plaintiff, Sperry Rand, prior to entering employment with the plaintiff, to try to persuade it to go into the semiconductor business. Sperry Rand liked the de-

---

4. We note that Section 757 is omitted from the Restatement (Second) of Torts (1979) because in the opinion of the editors the law of trade secrets has developed independently into a body of law in its own right, separate from its origins in tort law. The tort premises are nonetheless an integral part of the developed case law of trade secrets, and the fact of omission of this section from the Restatement does not negate that to claim a trade secret one must prove that the secret was in fact treated with a requisite amount of secrecy. See *Wheelabrator Corp. v. Fogle, 317 F.Supp. 633 (W.D.La. 1970); United States Plywood Corp. v. General Plywood Corp., 370 F.2d 500 (6th Cir. 1966); and Shatterproof Glass Corp. v. Guardian Glass Co., 322 F.Supp. 854 (E.D.Mich.1970).*

fendant's idea and employed him to investigate the economic feasibility of entering the semiconductor area. The defendant submitted recommendations which were adopted by plaintiff, and defendant was put in charge of the operation, in which the plaintiff expended huge sums of money in the development thereof. The defendant's process was later used by defendant and others in direct competition with Sperry Rand. The defendant was methodical and calculating in his resignation from the plaintiff company, taking approximately thirty workers with him into the competing company. In this case, the Court stated at page 565:

"The essential points are that Sperry developed *at its own plant and at great expense* a process for the production of silicon alloy junction transistors which *were superior* to other transistors on the market. It had kept its process secret; no other manufacturer knew the process or used it. As a result Sperry had a distinct competitive advantage." [Emphasis added.]

All these findings by the Court were substantially supported by the evidence before the Court. Such evidence is absent here.

The Appellee also asserts that a computer program conceived and developed by a company is a trade secret protected by law from unlawful use, relying on *University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518 (5th Cir. 1974).* In that case, the parent company had developed and owned a computer program which was pirated away by a subsidiary in a devious manner. There was no question of who owned the program—it was owned by the parent. That is not the situation here. There is no question that a computer program can qualify as a trade secret. The question is, is it one under the circumstances of this case?

In *Structural Dyn. Res. Corp. v. Engineering Mechanics Research Corp., 401 F.Supp. 1102 (E.D.Mich.1975),* the Court dealt with charges against three former employees of Structural Dynamics Research Corporation [S.D.R.C.] for unfair competition, misappropriation, and misuse of confidential trade secret material and breach of contractual duty not to disclose confidential information. The Court identified the defendants as the discoverers and then commented on the effect this proposition has on the issue of trade secrecy. It stated:

"One argument is that such an employee's skill, experience and knowledge should be protected. Some scholars point out that relief [to a former employer] 'may be denied in cases where the secret has become such an important part of an employee's job skills that he will have difficulty in obtaining a new position if he cannot take it with him.'" 401 F.Supp. at 1110, citing Developments in the Law—Competitive Torts, 77 Harv.L. Rev. 888, 949 (1964).

The Court then approached the concept of whether a process is a trade secret from the point of view of weighing the fact that in a highly technological society useful knowledge should be disclosed, against the fact that secrecy may favor and motivate inventiveness, with special consideration given to the genuine concern for the technically skilled worker whose job mobility may be diluted if knowledge he acquires is deemed to be a trade secret. The Court noted, in determining the existence of a trade secret which gives rise to either a contractual or fiduciary obligation not to disclose to others or adopt to one's own use, that:

"Vital to a consideration of the creation of duty in such situations is the key question as to *how the person acquiring such trade secret knowledge obtained it.* If the subject matter of the trade secret is in being and an employee learns about it in the course of his employment in a relationship of confidence, the duty not to use or disclose trade secret knowledge adversely to his employer arises. *On the other hand, if the subject matter of the trade secret is brought into being because of the initiative of the employee in its creation, innovation or development even though relationship is one of confidence, no duty arises since the employee may then have an interest in the subject matter at least equal to that of his employer*

*or in any event, such knowledge is a part of the employee's skill and experience."* 401 F.Supp. at 1111. [Emphasis added.] The Court did find in this case a breach of duty by the defendants on the basis of an exceptionally broad non-disclosure clause in their employment contract, which used the language, "Employee [will not] divulge to any person, firm or corporation . . . any privileged or confidential information, trade secret, or other proprietary information including but not limited to the experimental and research work of the corporation, its methods, formulae, drawings or appliances, imparted or divulged to. . ." This language was embrace enough to cover the subsequent actions of defendants in setting up a business using a computer system very similar to the one they had created for their former employer. The language of the Amoco employment contract is not so comprehensive.

The above cases point out that in trade secret litigation, courts are looking at the equities of the given set of circumstances out of which the claimed trade secret arises. The courts are then balancing those equities between the right of the company to use its employees and resources to its utmost advantage against the right of the highly developed mind and skill of the employee. Factors to be considered are how many of the innovative elements in the newly developed process are available in the prior art; how closely tied is the development to intrinsic knowledge of the innovator. In other words, is it possible to sort the process from the inner workings of a man's knowledge; did the company treat the innovation with the requisite secrecy to place others on notice of its claim? Other considerations are time and money and company facilities used in its production, and the employer's own knowledge thereof.

The evidence before the Trial Judge as to the existence of a trade secret is at best inconclusive because the Judge relied on the bare definition of trade secret, i. e., "a secret process that gives Amoco a business advantage." It is interesting to note that this case differs from other trade secret cases in that here the employer did not divulge a secret to the employee, and the employer does not even know how the system works without its employee. We therefore hold that the Lindley System is not an invention within the meaning contemplated by the parties to this contract, in light of the considerable "patent application" terminology. Nor is there sufficient evidence in the record, absent the erroneous finding of invention, to show that a trade secret exists which belongs to Amoco.

 It may very well be that Amoco intended to cover the contingency of development of computer programs in its form contract, but the fact is it did not. It is a common reality that printed contracts will be construed most strongly against the party who prepared them. *Continental Federal Savings and Loan Ass'n v. Fetter, supra.*

### III.

 Finally, we address the issue of the propriety of the issuance of the temporary injunction under the above stated circumstances. It is well settled that:

"The granting or refusing of injunction rests to some extent within the sound discretion of trial court, and its judgment . . . will not be disturbed on appeal unless it can be said the court abused its discretion, or that the judgment rendered is clearly against the weight of the evidence." *Johnson v. Ward, 541 P.2d 182, 188 (Okl.1975).*

But it must also be stated that injunction is an extraordinary remedy, and relief by this means is not to be lightly granted. The discretion of the Court must be exercised within sound equitable principles, taking in all the facts and circumstances in the case. *Cloer v. Gillespie, 386 P.2d 1015 (Okl.1963).* It is also equally clear that since an injunction is of equitable nature, the Supreme Court has the power to consider all evidence on appeal. *Board of Regents v. National Collegiate Athletic Ass'n, 561 P.2d 499 (Okl. 1977).*

 Here, we hold that the court below committed a clear mistake of law and has abused its discretion in granting the injunction.

For Amoco to establish a right to this injunctive relief, the burden was on it to show that the Lindley System was its "property" by virtue of the contract, or its "trade secret" by virtue of its actions in so delineating a secret proprietary interest in the system. Amoco never argued that the system was an invention; the Trial Judge merely so held. The present evidence, as stated elsewhere herein, does not establish the existence of a trade secret.

The harm to be occasioned in absence of an injunction must be irreparable to the Plaintiff. Amoco has not shown such harm. It alleges that Lindley is constructing a system for his present employer that will duplicate the Lindley System, while at the same time alleging it does not know what is contained in the Lindley System because Lindley won't divulge this information to it, because of his honest belief that the system is his own property. Amoco's own witnesses testified to the fact that the Lindley System is operational at the present time, but they believe it capable of doing more— just what, they don't know. These statements hardly add to Amoco's claim of ownership, nor do they aid Amoco's claim that Lindley will do them irreparable harm by "duplicating" the Lindley System in the system he was designing for another company. Amoco's witnesses freely admit computer programs in the area of well log analysis are available commercially, that Lindley has incorporated known data in his program, and that it is not new or novel— only better. Amoco withheld any kind of encouragement until the system resulted in large hydrocarbon finds, and it asserted no ownership rights until the gentleman left its employ, taking with him his unique skills and experience. An injunction has the purpose of keeping the status quo and should not give a remedy which can only be done by a trial on the merits.

5. The injunction states in relevant part:
"[D]efendant is temporarily enjoined during pendency of this action, and until final judgment is entered after trial on the merits from using any part or portion thereof for his own benefit, or for the use and benefit of any third party or entity.
"It is further ordered . . . Defendant is . . . enjoined from making any dis-

The rules for injunctive relief against a claim of "trade secret" are stated in 43A C.J.S. Injunctions § 151:

"Injunctive relief against the use of trade secrets is discretionary, and depends on the facts and circumstances of the particular case. On equitable principles and in consideration of public policy, relief by injunction should not be granted *unless the claim that the plan or process is a trade secret* is clearly established, . . . While injunction may issue before the use or disclosure of a trade secret occurs, *a trade secret will not be protected by an injunction on the mere suspicion or apprehension of an injury*." [Emphasis added.]

Amoco has only a suspicion that Lindley's new system will harm it, nothing more.

Amoco has the burden of showing the need for equitable relief, and its evidence cannot be aided by the erroneous findings of the Trial Judge. Under the circumstances of this case, the Judge has clearly abused his discretion. Even if we could find the evidence supports the issuance of the injunction, it would fail because it is too vague.[5]

The injunction enjoins the employee from divulging the invention "including the concepts thereof". No attempt is made to explain what is meant by the term "concepts". In *Xerox Corporation v. Neises, 31 A.D.2d 195, 295 N.Y.S.2d 717 (1968)*, a case with very similar facts to those present here, the Court stated:

"Moreover, a decree granting injunctive relief, whether temporary or permanent, must define specifically what the enjoined person must or must not do, in language so clear and explicit that a lay-

closures to third parties or entities of the confidential information and/or sub-routines, including *the concepts thereof* that constitute and comprise the Lindley II Log Analysis System except . . . does not enjoin Defendant from utilizing any part or portion [thereof] that is commercially available." [Emphasis added.]

man can understand what he is expected to do, or refrain from doing, without placing the one enjoined in the position of acting at his peril." [Citations omitted.]

The Court, by failing to define concepts, places the Defendant in the precarious position of acting at his own peril. He can develop his new computer system and hope that a trial on the merits will find that the Lindley II System was his property. But should the trial go the other way, he has expended great energy, time, and financial resources for nothing. His alternative is not to work in the area, and under the undisputed circumstances of this case that is simply inequitable.

In *Superior Oil Co. v. Renfroe, 67 F.Supp. 277 (W.D.Okl.1946)*, a geologist was found guilty of duplicating confidential information of his employer, disseminating them to third parties, and using them for his own profits. The Court, on the undisputed evidence, did issue a temporary injunction precluding the defendant from use of the ill-gained data, but the Court specifically identified those items and added:

". . . it being understood that this injunction is not to preclude or hinder the defendant from the practice of his profession, even in the territory involved in this case, so long as he does not use the information, data and maps above described." 67 F.Supp. at 282.

The default judgment is hereby vacated, the injunction is dissolved, and the case is remanded for a trial on the merits as to whether a "trade secret" exists to which the Plaintiff is entitled to claim ownership.

REVERSED AND REMANDED WITH INSTRUCTIONS.

LAVENDER, C. J., IRWIN, V. C. J., and WILLIAMS, HODGES, SIMMS, DOOLIN and HARGRAVE, JJ., concur.

OPALA, J., concurs in part and dissents in part.